CASE 6—ACTION BY W. F. OWSLEY. SR., AGAINST W. F. OWSLEY, JR., TO RECOVER LAND.—DEC. 10.

# Owsley, Sr. v. Owsley, Jr.

APPEAL FROM CUMBERLAND CIRCUIT COURT.

FROM AN ORDER SETTING ASIDE A JUDGMENT FOR PLAINTIFF, HE APPEALS. AFFIRMED.

LAND—PAROL GIFT—FATHER TO SON—POSSESSION BY DONEE—JOINT OCCUPANCY BY DONOR—ADVERSE POSSESSION—REQUISITES—EFFECT—EJECTMENT—MOTION FOR NEW TRIAL—NEWLY DISCOVERED EVIDENCE—MATERIALITY—DILIGENCE—DECLARATIONS AGAINST INTEREST.

Held:   1. Admissions by plaintiff that he had given defendant his farm, and that defendant was in possession thereof, and his testimony in a lawsuit to the same effect, do not conclude plaintiff, or preclude a jury in ejectment from finding for him, if he had not in fact surrendered possession and control.

2. A private memorandum or account book, in the handwriting of a party to a litigation, containing admissions damaging to his cause, the existence of which is concealed, is material evidence, which the ordinary diligence of his adversary could not have produced at the trial, when he not only did not know of the existence of such account, but was misled by the testimony of his opponent into supposing that no such book was in existence.

3. Where newly discovered evidence is unerring and convincing, satisfying the mind of the judge that it will probably have a preponderating influence upon another trial, a new trial should be granted.

4. In ejectment by a father against his son, where the son claimed by adverse possession under a parol gift, newly discovered evidence after judgment against the son, developing from testi-

mony of the father in an action between him and the son's wife, to the effect that for some twenty-five years the father had kept an account, in which all the expenses of maintaining and operating the farm had been charged to the son, in the way of advancements to him, authorized a new trial.

5. Possession by the donee of land under a parol gift will ripen into a fee simple title.

6. Possession, to toll the right of entry by the legal title holder, must be an actual physical entry or control of the premises, continuous, open, so as to afford notice of its hostile character, adverse, in defiance of the title holder, and such as to exclude his authority, and accompanied by a claim of title.

7. The fact that a father, who has made a parol gift of land to his son, remained on the premises with his son, was not such a breach of the son's possession as to stop the running of limitations in his behalf, where the father did not accompany his presence by any claim or act of ownership, but disclaimed ownership, admitting it to be in his son.


J. H. C. SANDIDGE, ALLEN SANDIDGE, W. P. SANDIDGE, AND CARROLL & CARROLL, FOR W. F. OWSLEY, SR.

POINTS AND AUTHORITIES.

The original action. 1. Appellant's own evidence showed that he had not been continuously for fifteen years in the actual, adverse, and exclusive possession of the land in controversy. Tiedeman on Real Property, secs. 698, 703, 714; Medlock v. Suter, 80 Ky., 101; Thompson v. Thompson, 93 Ky., 435; Commonwealth v. Gibson, 85 Ky., 663; Larwell v. Stevens, 2 McCreary U. S., 111; Am. & Eng. Ency. of Law, vol. 1, p. 834, 2d ed.; Hord v. Bodly, 5 Lit., 89; Jones v. McCauley's Heirs, 2 Duv., 14; Trotter v. Cassaday, 3 Marshall, 365; Jones v. Childs, 2 Dana, 31.

2. There was no adverse possession even from the date of the alleged gift down to the formation of the partnership in November, 1887. Commonwealth v. Gibson, 85 Ky., 666; Tiedeman on Real Property, sec. 703; 83 Am. Dec., 483.

(a) Appellee was never completely disseised. Commonwealth v. Gibson, 85 Ky., 666.

(b) Appellee exercised his right of entry on numerous occasions after October, 1874. 5 Lit., 88; 83 Am. Dec., 497; Tribble v. Frame, 7 J. J. M., 600; Tucker v. Phillips, 2 Met., 416; Maysville & Big Sandy R. R. Co. v. Holton, 100 Ky., 668; Tribble v. Frame, 5 Lit., 187.

The suit for a new trial. 1. The alleged newly discovered evidence is not of a certain or decisive character. Louisville Insurance Co. v. Hoffman, 24 Ky. Law Rep., 980; Brunk v. Means, 11 B. Mon., 214; Johnson v. Stivers, 95 Ky., 128; Rider v. Sullivan, 15 Ky. Law Rep., 749; Mercer v. Mercer, 87 Ky., 21; Hall v. French, 10 Ky. Law Rep., 399.

2. None of the alleged charges against W. F. Owsley, Jr., were made prior to 1880.

3. Only a part of the wages of domestic servants and farm laborers, and only a part of the expenses incident to running said farm, were charged to appellee, even after 1880.

4. No wages and no expenses of operating said farm, and no part of the family supplies were, as a matter of fact, charged to W. F. Owsley, Jr.

5. The alleged newly discovered evidence was not in any sense controlling.

6. Appellee knew of the existence of the alleged newly discovered evidence when the original suit was tried.

HAZELRIGG & CHENAULT, ATTORNEYS FOR APPELLEE.

I. The funds admitted to have been received by Judge Owsley belonging to the appellee, are as follows:

| | |
|---|---:|
| In cash from guardian | $1,200 00 |
| Arbitration money | 1,058 00 |
| Four bonds, principal | 4,000 00 |
| Sale of Missouri lands about | 5,000 00 |
| | $11,258 00 |

2. It is conceded that this money was received by Judge Owsley directly from the wife's guardian and from the purchasers of her land without the aid or intervention of the husband, save perhaps, in one instance, a check happened to be made payable to him for $1,000, and which was carried immediately by the husband and handed to Judge Owsley.

3. It is not contended or suggested anywhere that Judge Owsley got the girl's money under any arrangement with her husband. It is not suggested in the pleadings or in appellant's testimony that he ever had any talk with his son about receiving the wife's money, or made any arrangement with him to receive same.

4. So the question is, why and at whose instance did he secure it and undertake its control?

5. But one answer can be given. He received her estate under

the arrangement with his daughter-in-law as shown by her own testimony, and abundantly corroborated by the testimony of other witnesses.

6. Having established the contract under which Judge Owsley undertook to manage this girl's money by abundant affirmative proof, and by the judge's own admissions, and in a measure by the entries on his books—how does he rid himself of the obligation to pay it back to her?

7. He is forced to take the position that he got hold of $11,-000 without anybody asking him to do it—just taking it—and now we are told he just began at once to dish it out to his alleged extravagent son without any pretense of authority from the rightful owner.

8. Aside from denying the arrangement we claim he made with the appellee, the excuse offered in defense of the rightful owner's just demand, is that the money was paid out to the son as shown by the account drawn from certain "head books."

9. What do these head books show when read in connection with Judge Owsley's own deposition? Just this, that he has advanced his son in running the farm, and in improving it and keeping it in repair, in insuring the house, in maintaining the "horse" business, including stables, and the construction of a whiskey house "covered with tin," including the maintenane of the judge's own family in large part, some fifty odd thousand dollars, (not ninety odd as we shall see.)

10. These entries were *advancements* to the son and were plainly so intended by Judge Owsley. His testimony is conclusive on this point. They were therefore not *payments* to the wife or to the son for her, and were never so intended. The judge says they were not advancements to the son in the sense that he expected to get them back, but that, of course, the son was to account for them. They were advancements, pure and simple.

11. And these *advancements* are far less than the advancements made to his daughter, Mrs. Grant, as shown by the carefully prepared statement of her advancements taken from the head and cash books in the handwriting of Judge Owsley, and from his own deposition; and the other daughter, Mrs. Baker, received more than Mrs. Grant, as testified to by the old judge.

12. It is said that the English cases hold that where the income has been used by the husband in the maintenance of the family or otherwise with the acquiescence of the wife, she can recover only the principal and not its income. Of course, this is a just rule. But in such cases the trustee is not *deny-*

*ing his trust,* And moreover, the income is paid over to the husband *as income,* and because the wife, knowing her *income* is being consumed by the husband, does not complain for a long course of years, the court protects the trustee.

Here the trustee is denying his trust and can not consistently claim he was paying over these sums to the husband as the income from the wife's estate. Now can he claim that the wife knew her income was being so used, when he denies *she* had any income.

13. The defense of limitation or stale claim is wholly untenable. Instead of openly repudiating the trust as in the Helm case, relied on by appellant, (Helm's Exr. v. Rogers, 81 Ky., 569), the appellant repeatedly said he was holding appellee's funds for her and largely·increasing it.

We believe that any other conclusion than that the judgment below should be *affirmed* would be a monstrous wrong to the appellee; and to effect complete justice, she should really have more than is allowed her in that judgment.

OPINION OF THE COURT BY JUDGE O'REAR—AFFIRMING JUDGMENT AWARDING A NEW TRIAL.

W. F. Owsley, Sr., a retired banker and merchant, and a man of wealth, owned and lived upon a farm of 235 acres on Cumberland River, near Burksville, Ky. The farm was well improved and was then worth about $10,000. His family in 1874 consisted of his wife, single daughter, son (appellee), and mother-in-law. His wife was frail and died about 1881. His mother-in-law was an invalid. The single daughter married Dr. Grant, and moved to Louisville in 1886. Appellant had only three children. Another daughter had married a Mr. Baker before appellant moved to the farm in question, and was living with her husband. The only son had never lived away from his father. He had been reared indulgently, and had all his life been the close companion of his father. The day he was twenty-one years of age, his father gave him $10,000 in secured notes, which were immediately redelivered by the son, with the request to his father to hold them and collect and reinvest them, which was done. In Octo-

● ber, 1874, the son married the daughter of an old friend and business associate of his father, and, at the latter's invitation brought his wife to his home to live.    The son claims that within a few weeks thereafter he and his father walked out on the farm one morning, when his father inquired of him his purpose as to a vocation in life.    He answered that he wanted to engage in farming; that he was not qualified for anything else; besides, that was in accord with his taste.    He says that his father expressed gratification at his choice, and thereupon told him that he would, and did then and there, give him that farm,' and all its stock, and for him to take charge of it; that he did then and there assume charge and took entire control of the farm; that upon returning to the house, appellant repeated in the presence of his wife and daughter-in-law what had occurred; that continuously from that time to the present, appellee has occupied, used, and controlled that farm, laboring upon it and improving it, under claim of title, as his own, exclusive of all others.    The father continued to live in the house.    His wife lived there, too, till her death.    His mother-in-law lived there till her death.    His youngest daughter lived there till her marriage to Dr. Grant.

The son (appellee) began to handle horses.    The father '(appellant) suggested to handle them on a larger scale and of a finer quality.    So they embarked in that business about 1887 under the style of W. F. Owsley & Son.    The father claims he had no interest in that partnership; that he merely loaned his name to give credit to his son.    The son claims that the partnership did exist; that he and his father agreed that the father would put into the enterprise the use of three other farms which he owned, lying adjacent to the home place, and the son agreed to put in the use of his farm, the home

place; that the father agreed to advance the necessary cash to conduct the business. It was continued about eight or ten years, and then abandoned. Whether it made or lost money is not clearly shown. An incident connected with the firm's bank account, in which the son took a position contrary to his father's views, and hostile to his interests, as he thought, produced strained relations between them about 1899. Up to that time all the expenses of running the farm, maintaining the family, even to clothing and schooling the son's children, were paid by appellant. Appellee claims that that occurred this way: That his father had the possession of all his money—the $10,000 and its accumulations; that every dollar of produce and stock sold from the place was taken by him and delivered to his father, who made, or was supposed to make, proper entries of it on his books. The purchase price of horses and other live stock brought to the place was likewise paid by appellant, and when they were sold by appellee he handed the money to appellant. Appellee says his father was cashier, as it were, and was helping him in his business; telling him all the time that he was keeping an accurate account of all that he paid out for him, and that it would be charged against appellee in the final settlement and distribution of appellant's estate. The father's sagacity and success as a business man were well known, and appellee says he relied on these qualities as aid given him by his father; that the daughters had been abundantly provided for by similar gifts, aggregating from $30,000 to $50,000 each; and that he understood from his father that he was by this conduct of his affairs giving him an equivalent sum. Following the difference above alluded to, appellant refused to pay certain bills contracted for the family in the usual course, including the payment of the

tuition and board of one of appellee's daughters at college, which appellant had been theretofore paying. Appellee's wife then said she would pay it, and for him (appellant) to charge it to her account out of her money that he had. Appellant denied that she had any money and denied that either of them had any money or any other property. Appellee and his wife had evidently been under the impression that they had considerable property. So she brought a suit to compel an accounting by appellant of her estate which she says he had received for her from her former guardian directly after her marriage. The facts of that controversy and its result may be seen in an opinion this day delivered in the appeal of W. F. Owsley, Sr. v. Sallie A. Owsley 25 R., 1194, 77 S. W., 394. Thereupon appellant left the home, electing, so he says, to be dispossessed, and brought an action of ejectment against appellee to recover the possession of the home farm of 235 acres. The case came on to trial regularly before a jury, resulting in a verdict and judgment in favor of appellant. Upon that trial, appellee testified to the facts in his favor above stated. Appellant denied that he had ever given to his son the home farm, or that he had ever surrendered the possession of it to him. A great many witnesses were introduced, whose testimony tended to show that appellee had been in the possession, claiming the farm as his own, and that they had heard appellant during many years state that he had given the farm to his son, who was in possession, and control of it. Appellee's defense relied upon an adverse possession for fifteen years under the parol gift, thereby vesting him with the title to the land. So that the whole case turned upon the question of who was in fact in the possession of the place

Owsley, Sr. v. Owsley, Jr.

during the time from 1874 till the suit was filed in 1900. The fact that both appellant and appellee had during the whole time lived there complicated the question. The further fact that appellant paid all the expenses, including farm hands, servants at the house, for fuel, grocery bills, clothing bills, for repairs in the way of fencing, new buildings, etc., was, unless explained satisfactorily crushing evidence to defeat the son's claim of possession. To offset that, appellee testified and proved that his father had the $10,000 mentioned of his (the son's) money in possession, and that it had been used in paying these very expenses. But it was shown that the money so paid out by appellant was largely in excess of the son's money which he held. This was explained by the son—that he also turned back to his father, as cashier, all money derived from sales of the produce of the farm and stock. Still, that fact, by itself, proved little or nothing, for it was not incompatible with appellant's claim of ownership and possession. Indeed, it proved about as much one way as the other. The son then claimed that some part of these expenses had been charged to his wife, whose money his father held. If appellant was using appellee's money and his wife's money in paying the family and farm expenses, it amounted to the fact that the family and farm were being managed and run by appellee, and not by appellant. But the amount expended exceeded in the aggregate both the son's and wife's personal estates which appellant had. Appellee also testified that his father at the time and at various times told him that he was giving him the sums so paid out for him; that they were in the nature of advancements, and would be, and were being charged against his interest in appellant's estate; that in this way

he was being equalized with his sisters. If this is true, it would amount to this: Appellant had given his son $10,000 in money, and paid out for him about $40,000 additional, net, which he at the time intended as, and which was in fact of the nature of, a settlement in life. It does not matter that the sums were paid out at different times and in small amounts. If the aggregate sum of $40,000 had been turned over to the son, and he had used it as it was used, it would not be questioned that it was his money, and that in so employing it, he had defrayed his own expenses, and would thereby have tended strongly to prove his possession of the farm upon which it was expended. Or if the $40,000 had been turned over to the son in one lump, and he had intrusted it to his father precisely as he did the $10,000, and then the father, at his son's instance, had paid the latter's bills and accounts for managing and running the farm, it would be the same thing, in fact and in law, as if the son had done the paying in person. So it will be appreciated that the question of appellant's intent, and of his statements to his son that he was giving him, as a portion in life, these various expenses, was not only of material, but might be of controlling importance in fixing the question of who was actually in possession of the farm. Appellant testified in that action as a witness on his own behalf. He claimed that he had managed the farm during all those years, claiming it as his own, and that he had not paid any of the expenses mentioned either out of his son's or daughter-in-law's money, and had not told his son that these payments were gifts to him, and that he had not charged or intended them as such. Admissions against interest are not of the highest order of evidence, and, when they do not amount to an estoppel, are by no means conclu-

sive.  So although many witnesses, fifteen or more in num-
ber, testified that appellant had told them at various times
running through the period of twenty-five years in question,
and although appellant in a certain lawsuit had testified
under oath, that he had given appellee the farm, and that
appellee was in possession of it, yet if in fact appellant
had not surrendered the possession and control, the jury
in the ejectment suit were authorized in finding for him.

After the term of the court at which the ejectment ac-
tion was tried appellant gave his deposition as a witness
inhis own behalf in the suit pending in the same court of
Sallie A. Owsley v. Wm. F. Owsley Sr.  That case has
been referred to above.  To understand the question here
presented it is enough to state that in that action Mrs.
Owsley claimed that she had delivered to appellant, to
be held by him in trust for her, about $11,000 in cash, de-
rived from her father's estate, and that he refused to pay
it over to her or to account for it.  He denied the existence
of the trust agreement, and averred that he had already
paid it to her and to her husband at her instance.  In
testifying in that action in support of that defense, he
stated that the money was paid out to the husband, and at
his instance (but comparatively little of it was paid to her
directly), in the matter of paying his accounts.   These
accounts were put in evidence.  They were for merchan-
dise for his family, grocery supplies, fuel, servants' hire,
wages of farm laborers, purchase price of the horses and
other live stock bought and brought to the farm; for fencing
and other improvements upon the farm.        Indeed,
it embraced every conceivable item of expense in manag-
ing and operating that farm, including all the household
expenses, throughout the term in question.  She denied

that appellant paid these sums either for her or her husband, otherwise than as gifts by way of advancements to W. F. Owsley, Jr.   Appellant, in testifying, said that they were accounts charged to her husband—every dollar of it. He was confronted on cross-examination by his statement on the trial of the ejectment suit that none of these matters had been charged to her husband or to her, and asked to explain it.   He answered that the question involved in that suit was one of possession, and that he made the statement on the trial of the ejectment suit "for the purpose of possession," whatever that may mean.   But the important fact was developed in the examination that appellant had kept certain books, which he called "headbooks," and cashbooks.   On these he undertook to enter every financial transaction of his life, as it occurred daily, from about 1861 to that time.   These headbooks were small pocket memorandum books.   They were more in the nature of a diary of his money transactions.   They were in no sense books of account, or what is known as "shopbooks."   From these books appellant drew off in or about the year 1894 an account against his son, Wm. F. Owsley, Jr., charging him thereon with all the items constituting the expense of running the farm and the household from 1874, down to the date the account was stated.   He says that he was then engaged in drawing off the accounts of all his children, with the view to seeing what he had advanced or paid out for them.   About that time he made a will.   This statement and these books, with appellant's testimony in the Sallie A. Owsley Case, show indisputably the following facts:   That appellant did keep a memorandum of every item paid to or for any of his children; that he had, before this suit, and before any controversy, drawn off an ac-

Owsley, Sr. v. Owsley, Jr.

count against each of his children, setting down the item he deemed it proper to be charged to each, not with any intention or expectation of having them account for them, but to "see how much he had advanced to them," as he put it; that on Wm. F. Owsley, Jr.'s, account were included the items which the son claims were paid for him as gifts to become advancements, These books and accounts are all in the handwriting of appellant, and show what was probably his intention at the time of the payments made by him. The will made by him at or near the time these accounts were drawn off was not produced. Appellant says that since this controversy he had destroyed it and written another. When asked what the destroyed will contained, his counsel objected, and advised him not to answer. Though pressed, he refused to answer. It may be that that will would have shown conclusively the purpose of drawing off the accounts, as well as the purpose in carefully keeping a diary of money and property paid for or given to his children. Upon these developments in the Sallie A. Owsley suit, appellee filed his petition in the Cumberland circuit court for a new trial of the ejectment suit, alleging newly discovered evidence, to-wit, the fact that his father had kept an account in which all the expenses of maintaining and operating the farm since 1874 had been charged to appellee, that the fact of the existence of the books and accounts was unknown to appellee till after the term of court at which the ejectment case was tried, and that he could not have learned of it sooner by any sort of diligence. The circuit court granted a new trial. This appeal is prosecuted to reverse that judgment.

A private memorandum or account book, in the handwriting of a party to a litigation, containing admissions damaging to his cause, the existence of which is concealed, if discovered

after the trial, are clearly of that character of material evidence which the ordinary diligence of his adversary could not have produced at the trial. The adversary party not only did not know of the existence of such an account, but was further misled by the testimony of his opponent into supposing that none was in existence.

It is objected, though, that the newly discovered evidence is merely cumulative, and, as this court has repeatedly held that a new trial will not be granted upon the discovery of evidence that is only cumulative, the circuit court should not have granted this new trial. The newly discovered evidence was of a higher grade and different character from any heard on the original trial. It was not cumulative in the sense of the term as generally employed in opinions passing on that question. The trial court is enjoined to disregard those matters of practice that do not affect the substantial rights of the parties. Section 134, Civil Code. It is because of this policy, and the phrase in section 340, Civil Code, "material to the party applying," that this court holds that the discovery of more evidence of the same character and grade as that already heard and considered by the trial court, and which would not, in all probability, affect the result of another trial, will not justify the granting of a new trial. But where the newly discovered evidence is of a character that is unerring and convincing, satisfying the mind of the judge that it will probably have a preponderating influence upon another trial, a new trial should be granted.

If appellant's position in the Sallie A. Owsley suit as to charging these items to and furnishing them for his son is true, it would follow that, if appellant died intestate, these items, or the great bulk of them, could be charged against appellee's interest in his father's estate as advancements.

Appellee would in that event be made to pay for them.    Yet in the ejectment suit they were necessarily treated by the jury, because of W. F. Owsley, Sr.'s, statements when testifying, as not being appellee's accounts.    If the truth is that these items were given to him by his father as advancements, for which he will ultimately have to account, then appellee ought to have the benefit now of that fact, as bearing on the question of his possession and control of the farm in dispute.

But the    question most seriously urged is whether the evidence upon the former trial, even when considered with that newly discovered evidence, does not show that as a matter of law, appellant was never out of the possession of the farm.    It is conceded that by the parol gift no title passed to appellee.    Nor did appellant's admission that he had given his son the property, nor did even his oath to that effect in a trial in another case, divest appellant of his title. If that has been done, it is solely because appellee has, by a continuous adverse possession for 15 years under claim of title thereby acquired it.    It has been decided a number of times by this court that such possession by the donee under a parol gift will ripen into a fee simple title.    Commonwealth v. Gibson, 85 Ky., 666; 9 R., 205; 4 S. W., 453; Thomson v. Thomson, 93 Ky., 435, 14 R., 513, 20 S. W., 373; Creech v. Abner, 106 Ky., 239, 20 R., 1812, 50 S. W., 58; Gilbert v. Kelly, 22 R., 353, 57 S. W., 228.

But it is urged with great force that appellant has never been disseised; that he has daily entered upon the premises in dispute, and has exercised acts of dominion over them; and that the law attaches the actual possession to the holder statutory period necessary to toll the right of entry by the on the disputed premises.    The character of possession for the of the legal title when both he and an adverse claimant are up-

Owsley, Sr. v. Owsley, Jr.

legal title holder must be such as amounts constantly to a
trespass against the true title (that is, it must be an actual,
physical entry upon or control of the premises, and be con-
tinuous); it must be open (that is, it must of itself be such
as to afford notice to the rightful owner of its hostile nature) ;
it must be adverse (that is, it must be against and in de-
fiance of the claim of the real title holder, and be such as
to exclude his authority) ; and it must be accompanied by
the claim by the occupant that it is his property.    This claim
may be by speech, or by such acts of authority as indicate it.
It is obvious that two persons claiming against each other
can not at the same time be in the actual possession of the
same premises, either in law or in fact.    If both are present,
claiming the title, the possession is his who has the title.
The possession of the wrongful occupant in that case would
be restricted to that space over which he wields an exclu-
sive physical dominion.    But it does not follow by any
means that the mere presence of a person upon a piece of
property gives him the possession of it, either in fact or in
law, for any purpose; e. g., a guest in my house, or  the
presence of my servant or of a bare licensee.    It is equally
essential that the physical entry should be accompanied by
a claim of right.    So that if one enters, admitting the
title and possession of another as owner, the latter's pos-
session, in law, is not disturbed.    To oust the actual pos-
session of a claimant, another must enter, also claiming the
right of entry. When the owner sells or gives his land by pa-
rol, he is not forced to repudiate his act. He may recognize it
as valid if he chooses.    If his vendee is in possession, claim-
ing the title as a right, the owner of the legal title may ad-
mit, when subsequently entering upon the land, that both
the title and possession are in his vendee, and that his

presence is in no wise hostile thereto.    If he does, then by what principle of law can there be ascribed to his presence an effect which he neither designed nor at the time desired?    Why should the law claim for him that which he failed to claim, and claim it in spite of his intent?

Therefore, if appellant, though present on the land which he is alleged to have given to appellee by parol in 1874, and put him in the possession of, was not claiming the land as his own, but was, on the contrary, disclaiming it, and if he in fact exercised no act of ownership, in authority as owner, but was there as the guest of his son, the latter's possession was not thereby interfered with.

In Thomson v. Thomson, supra, it was held that an entry by a donee under a parol gift was hostile to the legal title, and, if possession was held thereunder for 15 years, the title in the donee was perfected.    In that case the court, in most emphatic language, approved this instruction as embodying the law of adverse possession:  "If the jury believe from the evidence that the plaintiff, Patrick Henry Thomson, made an absolute and unconditional verbal gift of his entire title to the land described in the petition to his son Rodes Thomson, and, in pursuance of such gift, he, the said Rodes Thomson, entered into the possession thereof, claiming title thereto according to such gift, and that such possession of said land continued for a period of fifteen years previous to Rodes Thomson's death, and during said period his possession was actual, visible, and notorious, then such possession is adverse, and the jury will find for the defendant."    In Commonwealth v. Gibson, supra, where a parol gift of land was made by a father to his children, and they had occupied it adversely for more than 15 years, it was said:    "If one in fact enters under a purchase or a gift, although it may

be verbal, and holds the land by actual, open possession,
claiming it as his own, such possession is adverse. . . .
The moment such possession begins, the owner is disseised,
. . . If, after entry, the newcomer claims the land as
his own, and the owner has notice of it, either actual or
constructive, then there is a disseisin." It is not shown
by either of the two foregoing opinions whether there was
or not an entry meantime by the donor. But in the later
case of Ward v. Edge, 100 Ky., 757, 19 R., 59, 39 S. W.,
440, it does appear that the gift by parol was executed by
the donee taking possession, while the donor, a widower,
continued to reside upon the premises for many years there-
after. The question was whether the donee had been in the
adverse possession for fifteen years. The court cites without
disapproval the character of evidence heard, which was in
many particulars substantially the same as in this case as to
the donee's claim and acts of ownership, and of the donor's
disclaimer and recognition of the title of the donee. The
court observed: "It seems to us the issue in this case is sim-
ply whether defendant had acquired title to the land in
dispute by gift from Walter Ward, and whether, under such
gift, he had held the same adversely to the donor, and with
the knowledge of donor, for the fifteen years." The
court approved the following instruction as correct-
ly stating the law applicable to the foregoing facts
and issue: "If the jury believe from the evidence that
Walter Ward, fifteen years or more before the institution
of this action, gave the land in controversy to the defendant,
and he under or by reason of said gift, took possession of
said land, claiming as his own adversely to Walter Ward,
with his knowledge, and continuously held and occupied it
adversely to and with the knowledge of said Walter Ward,

for a period of fifteen years or more before the institution of this suit, they should find for the defendant."

There was evidence before the jury in the instant case of appellant's contemporaneous claim of title and exercise of ownership, with his presence upon the land during the fifteen years.     It was a question for the jury whether there had been in fact a disseisin of appellant.  The only point we feel called upon to decide just here is that the mere fact of appellant's presence upon the premises now in dispute during the time of appellee's claim of possession and title was not ipso facto a breach of appellee's possession, and that if appellant did not accompany his presence by some claim or act of ownership, or if, on the contrary he disclaimed ownership admitting it was in appellee, then the statute would not be stopped in its running in the latter's behalf. The newly discovered evidence discussed above was of such material character, bearing on the question as to who was in the actual possession of the farm, that appellee was entitled to have it considered by the jury trying that question.

The judgment awarding the new trial is affirmed.

Chief Justice Burnam dissents, Judge Settle not sitting.