## Burnett v. Burnett, et al.

(Decided May 2, 1922.)

### Appeal from Graves Circuit Court.

1. Adverse Possession—Joint Occupancy.—Where a son, to whom a mother had conveyed certain land, delivered the deed back to his mother for the purpose of reinvesting her with title and then surrendered possession of the land, her holding immediately became adverse, and the statute of limitations was not interrupted by his subsequent return to and occupancy of the land, if, as a matter of fact, he took possession solely as the tenant of his mother and thereby recognized her superior claim to the land.

2. Adverse Possession—Finding of Chancellor—Sufficiency of Evidence.—In an action for the sale and division of land claimed to be owned jointly by plaintiffs and defendants as heirs of their mother, evidence held to sustain the finding of the chancellor that one of the defendants who had acquired title by deed from his mother to a portion of the land, had given the deed back to his mother for the purpose of reinvesting her with title and had surrendered possession, and that his subsequent occupancy was only as his mother's tenant.

3. Adverse Possession—One Holding Adversely for Fifteen Years Acquires Title.—One who holds land adversely for fifteen years acquires title.

J. C. SPEIGHT for appellant.

W. J. WEBB and CLYDE BURNETT for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Alleging that their mother, Izora Burnett, died intestate on December 27, 1919, the owner of an eighty acre tract of land located in Graves county, and that the title thereto descended to her children, the plaintiffs and defendants, five of the children, to-wit, K. Burnett, Clint Burnett, Nancy C. Magness, Hulda Cosby and Nora Bagwell, brought suit against the other children, to-wit, Cordelia Burnett, John Burnett and Jim Burnett, to sell the land on the ground of indivisibility. The defendant, James Burnett, filed an answer and cross petition denying his mother's title to forty acres of the land, and pleaded title in himself by virtue of a deed executed to him by his mother on April 5, 1898. He asked that his title thereto be quieted, and that the remainder of the land be sold. Cordelia Burnett and John Burnett filed an answer conceding the title of their brother James to the forty acres claimed by him, and asking that the remainder be sold for the purpose of division. In their reply to the answer and cross petition of James Burnett, plaintiffs pleaded a reconveyance by him to his mother in the year 1900. By another paragraph they pleaded that he surrendered all title and claim thereto in the year 1900, and that his mother had acquired title thereto by adverse possession. On final hearing the chancellor upheld the contention of plaintiffs and ordered the entire eighty acres to be sold for the purpose of division. James Burnett appeals.

The evidence is as follows: Mrs. Bagwell testified that Jim told her the week he was married that he had given the land back to his mother and did not want it, and that after he left, her mother told her that Jim had given her back the deed and showed her the deed. Mrs. Magness deposed that, after her mother's death, Jim came to her house and spent the night, and while there he stated that his mother had deeded him forty acres of her land, but that about the time he married he had deeded it back to her. This conversation occurred in the presence of her children, Goebel, Ora, Eliza, Aline and Carl,

and all of them say they were present and heard the conversation. Mrs. Magness also testified that, the next day, after the funeral, she and the other children spoke of selling the farm, and that James, though present, did not say a word about his owning any more land than any of the rest of the heirs. In this statement she was corroborated by K. Burnett and Clint Burnett. Hulda Cosby deposed that her brother told her the second year after he was married that he once had a deed to the forty acres of land, but that he had deeded it back to his mother. Ben Kinnemore testified that on one occasion Jim Burnett was talking about the place being a good farm, when he stated that he had owned forty acres of the place at one time, but when he married they all got mad at him and "rared so," that he just went and deeded it back to his mother. He also stated that on another occasion, while he and James Burnett were cutting wood for Mrs. Burnett, James made the same remark. J. H. Dulaney testified that a short time before Jim Burnett married, his mother came to his home and wanted him to go to her house and talk with Jim. When he arrived there, Mrs. Burnett informed him that she had deeded Jim some land for him to stay there and take care of her, but that he was going to marry that Dublin girl, and she was not going to live with her, and she wanted Jim either to deed the land back to her or give her the papers back. Whereupon Jim said, "I have agreed to do that very thing. I have agreed to do everything that she asked me to do." Loyd Holmes testified that, after the death of Mrs. Izora Burnett, Jim Burnett was speaking of buying the property and said to him that he and his sister Cordelia and brother John owned thirty acres of it, and he could buy the other fifty, but didn't believe that he wanted it bad enough to pay the price that he understood that his sister wanted. There was also evidence that the property was not assessed in the name of James Burnett, but was always assessed in the name of his mother or his brother John. Other witnesses testified that they had cultivated and lived on the land in controversy by contract with Mrs. Izora Burnett, and paid her rent for same. When James Burnett's deposition was taken as if under cross-examination, he testified that he had no recollection of deeding the land back to his mother. When asked as to the conversations with the various witnesses who testified for plaintiffs, he replied that he did not remember

whether he had had them or not. He did not recall whether or not he had ever given in the land for taxes, as he left that matter to his brother John. The third year after he was married, his mother sent his sister Hulda to tell him to come back and build on the land and live there just as he had been living. He bought the lumber, built a house and moved on the land. His mother told him she would give him what he made, and if he saw fit to give her a little corn, it would be all right, and if he did not, it was all right. He stayed there for two years and then moved to another place. He afterwards returned to the place, then moved away and returned again. The last time he stayed about a year. He thought that he gave his mother some corn. During the time he was away, he never collected any rent for the place. He promised his mother when he married that he would not bother the land and that she might have the land as long as she lived. The deed which his mother made stayed there with her. She made the deed to the land and put it in a box. He had the deed recorded, but did not remember which one carried it home. He often read the deed, but did not remember reading it after he was married. He got the deed out of the box about a week after his mother's death. In his second deposition he testified that his mother came with him to Mayfield the day the deed was written. After the deed was written the clerk handed it over to him and he carried it home and put it in the box where they kept all the papers. He married about two years after the deed from his mother to him was executed. His mother was afraid that she and his wife might not get along all right, and he then told his mother that he would never bother her home as long as she lived, and she seemed to be well satisfied. While living on the land in controversy, he also cultivated the other forty acres. He did not pay his mother any rent for the use of the forty acres he claimed, but gave her part of the corn from the other forty. He moved away from the land because there wasn't enough land for him. He remembered selling the chimney of the house to Dan Crittenden. He remembered the conversation that occurred between his mother and Mr. Dulaney. The best he remembered was that he told his mother then that he would never bother her as long as she lived. He also admitted the conversations with the other witnesses, but claimed that all that he said was that he had let his mother have the land back for her lifetime. His mother did not want him

to marry. She said she thought he ought to let her have the place back and he told her he proposed letting her have the place back as long as she lived. He would not say that he ever listed the property for taxes, but most of the time he was there his brother John run it and he just let him have it to run. He gave John the money three times to pay the taxes. He had told his brother John and sister Cordelia that he would deed the land to them as long as they lived. John Burnett testified that he remembered that his mother and James went to town to make the deed. He may have seen the deed, but had never read it. He had heard that it was not good. He never heard anything about his brother James deeding the place back to his mother. His mother was opposed to James' marriage. It was fixed up some way that was agreeable. He paid the taxes and sometimes Jim helped him pay them—Jim had told the others that he would deed the land to his sister her lifetime. He never said anything about deeding it to him. After his mother's death he found James' deed in the papers. He brought the deed down to see if it was good. He had heard Jim say that the land was his, but had also heard that the deed was no account. He then carried it to a lawyer and Jim said, "You just hand it over to me if he said it was good; if it is not good, I don't want it." Joe Burnett, a son of James Burnett, testified that the last time his father lived on the place, he cultivated eleven acres of corn. To the best of his recollection his grandmother got a portion of the corn. He had seen the deed from his grandmother to his father. It was there with the other deeds. F. L. Cloys testified that he had seen the deed from Mrs. Burnett to James. On one occasion Mrs. Burnett said that she had a crow to pick with him, that she had deeded her son forty acres to keep with her, and that he had taken him away. The night before his marriage Jim stayed with him and told him that they were raising sand about his getting married, and that was the reason he wanted to stay with him.

Although it be true that the delivery of the deed by appellant to his mother, for the purpose of reinvesting her with the title which he had acquired thereunder, was not effective for that purpose, it cannot be doubted that if he did deliver the deed for that purpose and did surrender the possession of the land to his mother, her holding immediately became adverse and the statute of limitations was not interrupted by appellant's return to and

occupancy of the land at different intervals, if, as a matter of fact, he took possession only as the tenant of his mother and thereby recognized her superior claim to the land. Owsley v. Owsley, 117 Ky. 47, 77 S. W. 397. But it is insisted for appellant that as Mrs. Burnett had previously conveyed the land to appellant, the presumption is that her possession was amicable, and that the evidence, which consists mainly of appellant's admissions, is not sufficiently clear and convincing to overcome that presumption and to show title by adverse possession. Let us examine the evidence in the light of this contention. In the first place it is not probable that Mrs. Burnett, who had eight children, would give appellant one-half of her land unless it was the understanding that he was to remain on the land and run the place for her. In the next place appellant admits that his mother objected to his marriage and said that she thought he ought to let her have the place back. When he first testified he said that he did not remember any of the conversations that he had with the witnesses for plaintiffs. On his subsequent examination he admitted having all the conversations testified to, but claimed that he merely told the witnesses, or stated in their presence, that he let his mother have the property back for her lifetime. In other words, he concedes that he surrendered the land to his mother, but insists that it was only for his mother's lifetime. All the witnesses say that he stated in their presence that he once had a deed to the forty acres of land, but had either deeded it back or given back the deed to his mother. It is not probable that all of them are mistaken, and that he, alone, is right when he says that he merely told them that he let his mother have it for her lifetime. Nothing could be more convincing than the evidence of Mr. Dulaney, a disinterested witness. He was a neighbor to the Burnetts and just before James Burnett got married, Mrs. Burnett came and asked him to come to her home. Mrs. Burnett informed him that she had deeded some land to Jim, but that he was going to marry the Dublin girl, and she was not going to live with her, and stated that she wanted Jim either to deed the land back to her or to give her the papers back. Jim then said, "I have agreed to do that very thing; I have agreed to do everything that she asked me to do." When appellant got married he left the land and remained away for two or three years. When he returned he did not come insisting that the land was his, but says that he returned at the invitation of his mother.

While he was away the land was rented out by his mother and she received the rent. While he was on the land, he paid his mother a portion of the corn, though he now claims that he was cultivating the other forty acres and the corn came off of that part. The deed which he received from his mother was found among her papers after her death. When the family first assembled to discuss the sale of the land, he made no claim that he owned more of the land than the other children. It was not until after the deed was discovered that he said that if the deed was good he wanted the land. It will thus be seen that appellant's admissions, which went to the very root of the matter, were made not only to the parties in interest, but to others who were not concerned in the result of the controversy. Not only so, but there is direct testimony that Mrs. Burnett demanded that appellant convey the land to her or surrender the deed, and that he agreed to do what she asked. When this evidence is considered in the light of all the circumstances, including appellant's own testimony and conduct, we conclude that it is sufficient to sustain the finding of the chancellor that appellant gave the deed back to his mother for the purpose of reinvesting her with title and surrendered possession of the land, and that his subsequent occupancy thereof was only as his mother's tenant. That being true, her holding was adverse, and as it continued for more than fifteen years prior to her death, it follows that she had acquired title by adverse possession.

Judgment affirmed.