# Kentucky Coal and Timber Development Company v. Carroll Hardwood Lumber Company, et al.

(Decided June 20, 1913.)

## Appeal from Breathitt Circuit Court.

1. Land—Adverse Possession—Evidence.—In an action involving title to timber on certain lands, evidence of adverse possession by the defendants' grantors examined, and held sufficient to take the case to the jury, and to sustain a verdict in favor of the defendants.

2. Land—Adverse Possession—Instructions.—In an action involving title to timber on certain lands, instructions examined and held properly to present the question of adverse possession.

3. Land—Timber—Severance— Title—Parol Evidence—Pleading.— Where a contract for the sale of timber is silent as to its severance from the soil and the time of removal, parol evidence of the intention of the parties is admissible without a plea of forfeiture.

4. Land—Timber—Severance—Title.—Where a contract for the sale of timber is silent as to its severance from the soil, the intention of the parties may be shown by parol evidence, and if it appears from the situation of the parties and from the circumstances surrounding them that a severance of the timber from the soil was contemplated at the time of the execution of the contract, the title of the vendee will be defeated unless he cuts and removes the timber from the land within a reasonable time, and a delay of fourteen years will, as a matter of law, work a forfeiture of the title.

5. Land—Timber—Severance—Time for Removal.—Where a contract for the sale of timber is silent as to its severance and time for removal, but the parties agree that the vendee is not to cut and remove the timber until a certain land company begins to operate in that vicinity, the vendee has a reasonable time thereafter within which to cut and remove the timber from the land.

6. Land—Timber—Severance— Title— Instructions.— Where in an action involving the title to timber, defendants claim the title by virtue of a deed executed fourteen years prior to the bringing of the action, it was error to assume in the instructions that the defendants had title, when there was evidence tending to show that at the time of the execution of the deed a severance of the timber from the soil was contemplated by the parties, and that the defendants had failed to cut and remove it within a reasonable time.

7. Land—Title—Adverse Possession—Evidence.—Where plaintiff relies on certain patents and defendants rely on the adverse possession of a remote grantor, it was not error to direct a verdict in favor of plaintiff as to the land covered by his patents, when the evidence failed to show that the defendants' grantor marked out a boundary and entered upon the lands covered by the patents

prior either to the time that the patents were issued or the sur-
veys made.

8.  Land—Excluded From the Petition—Peremptory. Instruction—
Error.—It is error to direct a verdict in favor of plaintiff for lands
excluded by the petition.

9.  Land—Patents—Location—Evidence.—Where the evidence of the
location of certain old patents is so vague, indefinite and uncer-
tain as to make their location a matter of mere guesswork, it is
not error to refuse to submit to the jury the question of their loca-
tion.

J. J. C. BACH, GRANNIS BACH, McGUIRE & McGUIRE and
HAZELRIGG & HAZELRIGG for appellant.

McQUOWN & BECKHAM, O'REAR & WILLIAMS, CHESTER
GOURLEY, C. W. CAMPBELL, G. W. FLEENOR and O. H. POLLARD
for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY,
COMMISSIONER—Reversing on Original and Cross Ap-
peals.

In the month of February, 1912, plaintiff, Kentucky
Coal and Timber Development Company, brought this
action against the Carroll Hardwood Lumber Company,
U. B. Buskirk and S. M. Croft, partners, composing The
Kentucky River Hardwood Company, Harrison Banks,
Lex Smith and Miles Smith, its employees, to enjoin
them from entering upon or cutting any poplar, walnut,
cucumber or ash trees from a tract of land consisting of
about 1,200 acres, and located in Breathitt county, Ken-
tucky, on the headwaters of the South Fork of Quick-
sand Creek, a tributary of the North Fork of the Ken-
tucky River.  The defendants, the Kentucky River
Hardwood Company and its owners, Buskirk and Croft,
denied the title of plaintiffs, and pleaded title in them-
selves to certain branded timber situated on the land
in controversy.  A temporary injunction was asked for
and obtained.  During the progress of the action plaint-
iff dismissed as to certain portions of the land included
within the boundary set out in the petition, and the
question of ownership and possesion of the branded
trees claimed by defendants was transferred to the ordi-
nary docket for trial by jury.  As to the timber on cer-
tain portions of the tract described in the petition, the
trial court gave a peremptory instruction in favor of
plaintiff. The question of ownership and title to the re-
maining part of the timber was submitted to the jury,
and there was a finding in favor of the defendants.

From the judgment predicated on the verdict, plaintiff appeals and defendants prosecute a cross appeal.

The principal chain of plaintiff's title is through a patent for 154,800 acres of land, issued to Stephen G. Ried, June 15, 1872, from which there are excluded 25,-800 acres of land theretofore patented and otherwise appropriated. Plaintiff proved his chain of title from Stephen G. Reid, and introduced its surveyor, H. H. Gibson, who testified that there were no patents older or senior to the Reid patent lying within the boundary in controversy except nineteen patents, some of which lie entirely within that boundary, while others lie only partially within that boundary. The following are the nineteen excluded patents:

(1) Benjamin Clemons patent, No. 11,141, for 50 acres, issued June 21, 1848, lying along South Quicksand Creek, at the mouth of Oldhouse Branch.

(2) Benjamin Clemons patent, No. 11,139, for 50 acres, issued _____, lying on South Quicksand Creek a short distance above Land Fork.

(3) Benjamin Clemons patent, No. 11,138, dated June 2, 1848, for 50 acres, lying on the South Fork of Quicksand, just below the mouth of Six Mile.

(4) Benjamin Clemons patent, No. 11,140, dated June 2, 1848, for 50 acres, lying on the head of South Fork of Quicksand, just above the mouth of Six Mile.

(5) Combs and Byrne patent, No. 43,139, dated January 1, 1870, for 200 acres, located just west of the old conditional line between Moses Clemons and John Clemons.

(6) Combs and Byrne patent, No. 43,147, issued January 1, 1870, for 20 acres, lying on Oldhouse Branch just above its mouth.

(7) Combs and Byrne patent, No. 43,138, issued January 1, 1870, for 200 acres, lying on Shepherd's Fork of the South Fork of Quicksand, adjoining patent No. 43,137.

(8) Combs and Davis patent, No. 43,343, dated August 8, 1868, for 200 acres, lying on the east side of the South Fork of Quicksand, including the mouth of Five Mile Branch.

(9) Combs and Byrne patent, No. 41,344, dated August 8, 1868, for 200 acres, lying at the head of Road Fork of the South Fork of Quicksand.

Of this land only a small portion of the southwestern corner is included in the land in controversy.

(10)   Daniel Duff patent, No. 25,277, issued June 23, 1847, for 50 acres, lying along the South Fork of Quicksand, and just below Boar Hollow.

(11)   John Clemons patent, No. 51,702, dated May 1, 1876, for 200 acres, lying on the Laurel Fork of the South Fork of Quicksand.

(12)   Moses Clemons patent, No. 41,338, issued ........................................, for a tract of land lying near the head of Two Mile.

(13)   John Clemons patent, No. 41,339, issued August 8, 1868, covering a tract of land at the head of Five Mile.

(14)   Manford Stacey patent No. 42,855, issued ........................................, covering a tract of land on Five Mile.

(15)   George Bradley patent, No. 42,773, issued May 3, 1870, for a tract of land on Six Mile.

(16)   M. J. Amix patent, No. 43,142, issued June 27, 1879, for a tract of land lying upon Upper Twin and Lick Branches of Main Quicksand Creek.

A small portion of land lies across the dividing line between Main Quicksand and South Quicksand, within the boundary in controversy.

(17)   The John Clemons patent, No. 41,340, issued August 8, 1868, for 100 acres, only a very small portion of which lies within the boundary in controversy.

(18)   Isaac Clemons patent, No. 20,774, for 50 acres, now known as the Goff tract, lying on Walnut Cove Branch of Two Mile.

(19)   C. B. McQuinn patent, No. 20,785, issued December 29, 1852- for 50 acres, a tract of land lying on Plum Cove Hollow and Cane Patch Branch of Two Mile.

Of the foregoing patented boundaries, Nos. 10, 11, 12, 13, 14 and 15 are expressly excluded by plaintiff's petition. Plaintiff also proved title through the Combs and Byrne patents Nos. 43,137 and 43,138 and dismissed its action as to Combs and Byrne patent No. 43,139. Plaintiff also claimed title under Combs and Davis patents Nos. 41,343 and 41,344. It further appears that Benjamin Clemons, who owned patents Nos. 11,138, 11,139, 11,140 and 11,141, died leaving fifteen children. Plaintiff has acquired by deed the interests of several of these children. Moses Clemons, one of the children, acquired the interests of seven of the children. Plaintiff showed further title to the land in controversy by purchasing from certain heirs and vendees of Moses

Clemons. These purchases, however, were made after the timber thereon had been purchased by defendants.

Defendants claim title to the timber in controversy lying on several tracts of land embraced in the boundary in dispute, by purchase from Hagins and Clark, who purchased the same from Harrison Clemons and from the widow and certain children of Moses Clemons. Defendants also attempted to prove a chain of title through Davis Ross and James Curry, under and by virtue of certain grants made by the Commonwealth of Virginia to Ross and Curry in the year 1788. The court, however, refused to permit the introduction of defendants' title under the Ross and Curry patents. Defendants, therefore, relied on the possessory title of Moses Clemons and his heirs.

As plaintiff owns an undivided interest in the four patents issued to Benjamin Clemons, and defendants own an undivided interest in the timber thereon, the trial court reserved for future determination the rights of the parties under and by virtue of those patents. Of this action of the trial court there is no complaint from either side.

Upon the question of Moses Clemons' possessory title to the main portion of the land, the evidence in substance is as follows:

For some time prior to the civil war, Benjamin Clemons lived on a place known as the ''Big Orchard,'' on the South Fork of Quicksand Creek, some seven or eight miles from the land in controversy. Some time later, having obtained the four patents hereinbefore referred to, he moved to the mouth of Oldhouse Branch. When he first moved to the Oldhouse Branch he made no claim to any of the land except the four patents referred to. Some two or three years later he marked out a boundary on the land lying around the head of South Fork of Quicksand, and the marked boundary enclosing this land is the one now relied upon by de-defendants. After Benjamin Clemons had been there for a while he extended his clearings up to the Oldhouse Branch. Some time after the close of the war, Moses Clemons, who was then living at Big Orchard, purchased the interests of certain of his brothers and sisters in the lands of Benjamin Clemons, who had died, and moved to the house built by his father at the mouth of Oldhouse Branch. He continued to live there for several years, when the house was burned, and he

then moved further up the creek to the house at the mouth of Land Fork. He resided at the mouth of Land Fork for some eight or nine years, and then moved to the place on Quicksand, leaving his children in possession of his boundary of land. Sometime after Moses entered upon the marked boundary, he extended the clearing made by his father at the mouth of Old Branch up said branch for a distance of about a quarter of a mile. A portion of this clearing was outside of the patent boundary on which Benjamin Clemons' house was located. He also made a clearing on Old Cove on the right hand side of the South Fork of Quicksand, a short distance above the mouth of Old Branch, and enclosed it with a fence. There were several acres in this enclosure outside of the patent boundary. From time to time, as the children grew up and married, he settled them at various places on the boundary. His daughter, who married W. J. Bach, was settled over on Two Mile Creek, and made a clearing on the tract known as the Bedford tract. This tract Moses Clemons afterwards conveyed to his son-in-law and wife in the year 1886. He also made a clearing at the mouth of Shepherd's Fork, at the mouth of Four Mile, and at the mouth of Land Fork, where he lived for a while. There is also evidence to the effect that he made a clearing at the mouth of Five Mile Creek and one on the Road Fork and near the mouth of Six Mile. The evidence further shows the cultivation and use of these clearings within the marked boundary, and that no one had any possession within the marked boundary except Moses Clemons and his children, and those claiming through them. Several witnesses testified that as far back as 1875 the boundary in question was well marked. It seems to have been marked by two or three different instruments. One set of marks appears to have been made with an axe, another with a knife, and still a third with a small hatchet or tomahawk. The timber was marked all around the boundary in question, though in some places the trees marked were as far as 100 or 200 yards apart, where the timber had been cut. Several of the witnesses say that they had gone all the way around the boundary, and that it was well marked. Some of the witnesses testified to having been only on part of the boundary, and that it was well marked. Some of these marks were pretty old, and some looked like they had not been made very long.

For defendants it is shown that at the time it is claimed Benjamin Clemons marked out the boundary in question Isaac Clemons and Charles McQuinn both had patents of land within the boundary, and that James Bradley owned the tract claimed by him, and the witnesses say that Benjamin Clemons never claimed any one of these tracts, though they were included within the marked boundary. A few of the witnesses say that the clearings made by Benjamin Clemons and Moses Clemons did not extend beyond the patents issued to Benjamin Clemons and Moses Clemons, while some of the witnesses say that if the clearings did extend beyond their patent boundaries, it was only to a very small extent. There is also testimony to the effect that the boundary in question was not marked all the way around, and that in some places the marked trees were from thirty yards to a quarter of a mile part.

The court instructed the jury as follows:

"(1)   The court says to the jury that they will find for the plaintiff unless they believe from the evidence that Moses Clemons enters upon the land in controversy and outside his patent boundaries, or some parts thereof for at least fifteen years before the 'entry of the plaintiff, or those under whom it claims, and before the filing of its petition herein, and that he and those claiming under him, used, occupied, controlled and claimed the same or some parts thereof as their own continuously, openly and notoriously for a period of fifteen years to a well defined or marked boundary; and if they so believe they will find for the defendants such land, and the poplar, cucumber and ash trees standing upon such lands as they believe from the evidence they have so held that bears the brands of the letter C or figure 2 and the figure 4 enclosed in a circle.'

"(2)   The court instructs the jury that an entry upon the land patented to Benjamin Clemons is not such an entry as is contemplated in instruction No. 1, and that in determining the question as to whether or not Moses Clemons had possession of the land described in the pleadings, they cannot consider any evidence offered by defendants as to the acts of ownership or entries on any of the land made by Benjamin Clemons outside of his patents.

"(3)   If the jury believe from the evidence that Moses Clemons entered in the land under Benjamin Clemons, his possession was confined to the patents

made in the name of Benjamin Clemons and the land fenced by the said Benjamin Clemons, unless Moses Clemons entered outside of said patents or enclosures, either by himself 'or tenants, and took possession of other lands, by clearing and fencing, with intention to possess the whole.''

Without entering into an elaborate argument of the questions involved, we deem it sufficient to state our conclusions as follows:

(1) There was sufficient evidence that Moses Clemons entered outside of his and his father's patent boundaries upon the land in question, made . clearings thereon, and used, occupied and controlled the same or some parts thereof, continuously, openly and notoriously for a period of fifteen years, to a well defined and marked boundary, to take the case to the jury, and we cannot say that their finding in favor of the defendants is flagrantly against the evidence.

(2) The instructions, so far as the question of adverse possession is concerned, properly presented the law of the case. Color of title was not necessary. New Domain Oil Gas Co. v. Gaffney Oil Co., 134 Ky., 792. Of course Moses Clemons could not acquire title against a superior title holder by merely occupying either his or his father's patents and claiming beyond his patent boundary, but if he entered upon the land outside of his patent boundary, made clearings thereon, and used, occupied and controlled the same, claiming to a well defined or well marked boundary, continuously, openly and notoriously for the statutory period, he thereby acquired title by adverse possesion.

(3) Defendants purchased the trees in question from the vendees of Hagins & Clark. In the deed the trees are described as being branded with the letter "C" or with the figure "2." The trees were of merchantable size. Hagins & Clark were engaged in the logging business. Some of the parties say that the trees were to be removed in three years; others that they were to be removed in five years. Hagins testified as follows: "We did not buy it (the timber) to have it taken out at that time, and we could not have had it taken out then without loss. It was a speculation, and we also had a verbal contract with the parties that we were not to deliver it at that time, not until somebody else could do something to help us; not until the Kentucky Union Land Company commenced to operate on the lower end

so as to help us get it out." Clark testified that they did not buy the timber with the intention of logging it themselves, but with the understanding that they might remove it whenever they came in with the Kentucky Union Company, so that the latter might help them fix the creek. It is the law in this State that where the contract itself fixes no time within which the timber sold or reserved is to be removed, the intention of the parties may be ascertained from facts outside the agreement, such as the situation of the parties and the circumstances surrounding them at the time the contract is executed. Hicks, et al. v. Phillips, et al., 146 Ky., 305. In the same case it is held that where the grantor in a deed conveying land, reserves the timber on a specified part of the land, and the deed is silent as to the time of the removal, and there is nothing in the stipulations of the contract or in the situation of the parties or of the circumstances surrounding them at the time the contract was executed to show that a severance of the timber from the soil was contemplated, the title to the timber specified remains in the grantor, and is not lost or defeated by failure to cut and remove the timber within a reasonable time. Manifestly the converse of the latter proposition is true; that is, if the situation of the parties and the circumstances surrounding them at the time the contract is executed are such as to show that a severance of the timber from the soil was contemplated, the title thereto may be defeated by a failure to cut and remove the timber within a reasonable time. In this case there were several circumstances tending to show that a severance of the timber from the soil was contemplated by the parties. We, therefore, conclude that the question whether or not a severance of the timber from the soil was contemplated by the parties should have been submitted to the jury. To justify the introduction of the evidence on this question, and the submission thereof to the jury, no pleading on the part of the plaintiff, alleging a forfeiture of the timber by reason of the failure of the defendants to cut and remove it within a reasonable time, was necessary. Plaintiff, claiming title to the land, sought to enjoin the defendants from cutting the timber. Defendants denied plaintiff's title, and asserted title to the timber. A question of title being involved, it was competent for plaintiff to introduce evidence tending to show a want of title on the part of the defendants. But it is insisted that the error of the trial

court in refusing to instruct the jury on this question is not available on this appeal, because plaintiff offered an instruction on the question and did not make the refusal of the court to give it a ground for a new trial. This is true, but plaintiff did except to the instructions given by the trial court, and allege the giving of erroneous instructions as a ground for new trial. The instructions actually given, while correct so far as the question of adverse possession is concerned, assumed, as a matter of law, in the face of evidence tending to show that a severance of the timber was contemplated by the parties, that defendants acquired and retained title by purchase from the vendees of Hagins & Clark. In this respect, therefore, the instructions given are erroneous. If, as a matter of fact, a severance of the timber from the soil was contemplated by the parties, then Hagins & Clark and their vendees had only a reasonable time within which to cut and remove the timber, and their failure to cut and remove it within fourteen years after the conveyance thereof is, as a matter of law, a failure to cut and remove it within a reasonable time. In that event, therefore, they have lost title to the timber in question. On the other hand, if it was agreed between the parties that the timber was not to be cut until the Kentucky Union Land Company commenced to operate on the lower end of the land so as to assist the defendants in getting out the timber, then the defendants had a reasonable time thereafter within which to cut and remove the timber. It not appearing exactly when the Kentucky Union Land Company did commence to operate, the question whether or not the parties did agree as indicated, and whether or not the defendants failed to cut and remove the timber within a reasonable time after the Kentucky Union Land Company did commence to operate, was for the jury.

On a return of the case the court will qualify instruction No. 1 by adding the words "unless you believe as in instruction No. 4," and will give in substance the following instruction, numbered 4:

Although you may believe from the evidence as set out in instruction No. 1, yet if you further believe from the evidence that at the time of the execution of the deed from the heirs of Moses Clemons to Hagins & Clark in the year 1898, the parties thereto contemplated a severance of the timber from the soil, you will find for the

plaintiff; or if you believe it was agreed at the time by the parties that the timber was not to be cut and removed until the Kentucky Union Land Company commenced to operate on the lower end of the land so as to assist defendants in getting out the timber, and that the Kentucky Union Land Company did commence to operate on the lower end of the lands, and that the defendants failed to cut and remove the timber within a reasonable time thereafter, you will find for the plaintiffs. But if you believe as set out in instruction No. 1, and further believe from the evidence that at the time of the execution of the deed from the heirs of Moses Clemons to Hagins & Clark a severance of the timber from the soil was not contemplated by the parties, or if you believe from the evidence that it was agreed by the parties that the timber was not to be cut until the Kentucky Union Land Company commenced to operate on the lower end, and after it so commenced to operate, if it did so, the defendants did not fail to cut and remove the timber within a reasonable time, you will find for the defendants.

## CROSS APPEAL.

(1) It is insisted that the court erred in peremptorily instructing the jury to find for plaintiff as to the lands embraced in Combs and Byrne patent No. 43,138, Combs and Davis patents Nos. 41,343 and 41,344, and M. J. Amix patent No. 41,342. In this connection it is argued that Moses Clemons marked a boundary embracing these patents, and extended his clearings over on the land covered by them prior to the time that the surveys were made or the patents issued. The patents were issued in the year 1870, on surveys made during the year 1868. One or two witnesses say that Moses Clemons moved to Oldhouse Branch some time after the war. The exact time is not definitely fixed. On the other hand it appears that Moses sold to his brother a tract of land by deed dated November 23, 1868. This tract of land covers Big Bottom, the place where Moses lived prior to moving to the residence of Benjamin Clemons. The deed, after describing the land, recites "being the same land where Moses Clemons at present lives." It is certain, therefore, that Moses Clemons did not move to the Oldhouse Branch until after that date. Furthermore, the precise time when he began to extend his clearings beyond his father's patents, and

began to claim to a marked boundary, does not satisfactorily appear from the evidence. It does appear, however, that in the year 189....., in a suit to partition the lands of Benjamin Clemons, Moses Clemons recovered judgment against his brothers and sisters for the land now in controversy. In that case he must have relied altogether on his own claim of adverse possession, and not upon any adverse possession on the part of his father. As a matter of fact his father did not have a marked boundary or clearings therein for the statutory period of fifteen years. Moses Clemons' claim to the land, therefore, depends upon when he began to hold adversely to his brothers and sisters. There is no satisfactory evidence in the record that he occupied any portions of the land embraced by the patents in question, claiming them to a well marked boundary, either prior to the patents or the surveys on which they are based. We, therefore, conclude that the trial court properly directed the jury to return a verdict in favor of the plaintiff for the land embraced by the patents in question, with the exception of that part of the Combs and Davis patent No. 41343, covered by the 5th exclusion mentioned in plaintiff's petition. In the petition, plaintiff expressly excludes certain lands. The Combs and Davis patent No. 41343 covers a part of the 5th exclusion. Therefore, the court erred in directing a verdict in favor of plaintiff for all the lands covered by that patent. The verdict should have been confined to that part of the patent not embraced within the 5th exclusion.

(2) The next question involves the propriety of the court's action in excluding from the consideration of the jury evidence tending to show that two of the Ross and Curry patents covered the land in controversy. The patents in question are a part of a large number of surveys made by one George Hart as deputy surveyor of Fayette county, and later of Bourbon county, Kentucky, in the years 1786, 1787 and 1788. Certain of these patents call for "Remarkable Long Rock House on Buckhorn."

Basing their arguments on the fact that in the original description of certain of the patents, the word "Troublesome" was erased and the word "Buckhorn" written over it, and the fact that all the surveys could not be placed on Buckhorn, and that there was no Remarkable Long Rock House on Buckhorn and there is one

on Troublesome, it is contended that these facts, together with others relied on, were sufficient to justify the location of these patents as contended for by defendants. As a matter of fact, however, the patents which it is contended cover the lands in controversy have no fixed corners. In order to place them so as to cover the lands in controversy, all of the Ross and Currie patents have to be located and placed with respect to each other. It is impossible for us, within the limits of a reasonably short opinion, to consider the arguments pro and con on the location of these patents, as contended for by defendants. The same contention was made in the case of Taulbee v. Buckner's Admr., 91 S. W., 734, and on a consideration of the question, the contention was held without merit. While ordinarily the location of a patent is for the jury, yet the evidence of its location must be of a kind tending to induce conviction. In this case the evidence is vague, indefinite and uncertain. At most it presents a theory altogether at variance with certain well established facts, and after all, is a matter of guess-work entirely. Long ago it was held that in no court ought a doubtful title prevail against a clear one. Preston's Heirs v. Bomar, 2 Bibb (Ky.), 493. Certainly, one with a good title should not have his rights guessed away.

Judgment reversed both on original and cross appeal, and cause remanded for a new trial consistent with this opinion. In the meantime the injunction will be continued in force.