## Rice, et al. v. Blair.

### Same v. Same.

(Decided November 25, 1914.)

#### Appeals from Johnson Circuit Court.

1. Land—Title—Adverse Possession—Limitation of Actions.—A suit to quiet title may be based upon title acquired by adverse possession for the statutory period of fifteen years; color of title is not a pre-requisite to the maintenance of such an action.

2. Land—Parol Gift of—Possession.—Where there is an unconditional parol gift of a well-defined body of land, accompanied by

an actual possession for fifteen years or over, with claim of ownership, such possession ripens into title, and the donor cannot recover the land.

3. Land—Possession.—If, however, one enters upon land by the owner's permission, expecting that the owner will give it to him, then such possession is not an hostile holding.

4. Land—Possession.—Where a father placed his son in possession of land which the son occupied and used for twenty-five years, paying his father a sum which was no more than a reasonable rent, and the father continued to occupy a part of the land, and to rent that which his son had occupied to other persons, at different times, and finally conveyed it by deed to his daughter, fourteen years before his death, the son was a tenant of his father and not the owner of the land by purchase or otherwise.

5. Appeal—New Trial.—A party who has been defeated in an action may prosecute an appeal and an action for a new trial at the same time, where the ground upon which he seeks a new trial is one of which he could not avail himself on the appeal.

J. F. BAILEY for appellants.

VAUGHAN, HOWES & HOWES for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

These two appeals have been consolidated and heard together. They rest mainly upon the same facts—the second appeal being from a judgment denying a new trial of the first action. The facts are substantially as follows:

John P. Blair, the father of appellee, Andrew J. Blair, and the appellant, Martha E. Rice, owned a tract of land situated on the middle and main forks of Jennie's Creek, in Johnson county, upon which he lived. John P. Blair was twice married; by his first marriage he had, among other children, three sons, Andrew J., Jesse, and Harry, who are mentioned in this litigation; and by his second marriage he left two daughters, Maggie Conley and Martha Ellen Rice.

On August 17, 1910, Andrew J. Blair brought this action against his sister, Martha Ellen Rice, and George Rice, her husband, claiming to be the owner of a small tract of land which comprised about one-third of his father's entire tract, stating that the defendants, Rice and wife, had forcibly taken possession of his land, and asking that his title thereto be quieted. Andrew Blair did not claim to have a deed to said land; he rested his ownership upon a verbal purchase from his father, fol-

lowed by his adverse possession of the land for more than thirty-five years. He says his father divided the land between his three sons in about 1880, and placed them in possession of their respective moieties.

When Andrew J. Blair moved upon the land thus allotted to him, he occupied a small piece of vacant land at the top of the hill, and to this piece Mrs. Rice is making no claim.

Upon taking possession, Andrew cleared and fenced a part of the land; built a small log house thereon; planted two orchards containing more than a hundred fruit trees; built an outhouse and a barn; and made other improvements, and continued to live there until about 1905, when, on account of the illness of his wife, he moved to Denver, Kentucky, a small town about a mile and a half from the land. His wife died in the spring of 1909, and Andrew J. Blair claims that when he attempted to move back upon the land, Rice had not only taken possession of it during his absence, but had torn down the stable and a part of the house, and refused to let Blair re-enter. Thereupon, Andrew Blair brought this suit as above stated.

There is no doubt that Andrew J. Blair occupied the land from about 1880 until about 1905—a period approximating twenty-five years. The difficulty arises in determining the character of his holding. Was he a purchaser claiming title, or merely the tenant of his father?

Rice testifies that John P. Blair, his wife's father, took possession of the farm upon Andrew's departure for Denver, and kept possession thereof; and that at the direction of John P. Blair, Rice tore down a part of A. J. Blair's log house; and that John P. Blair—not Rice—prevented Andrew from returning to the farm.

In the meantime, in 1892, and after his second marriage, John P. Blair divided his farm, which included the land in question, about equally between his two daughters, executing deeds therefor, which were duly recorded.

John P. Blair lived on a part of the land until his death, in about 1906, at the age of 104 years. The appellee, Andrew J. Blair, is seventy-three years of age. As John P. Blair died in 1906, and Andrew J. Blair did not seek to retake possession of the farm until after the death of his wife, which occurred in the spring of 1909, Rice and wife had possession of the farm from the death of John P. Blair, in 1906, up to the time this suit was begun, in 1910.

Rice and wife contend that Andrew J. Blair was never more than a tenant of his father; that his father retained possession of the land and only permitted his sons to occupy certain portions of it, and to make what they could out of it; but that he never parted with his title, and never intended to do so. The issue is, therefore, a simple one, and involves the nature of A. J. Blair's holding. If his possession was hostile, color of title in Andrew J. Blair was not necessary in order for him to maintain this action to quiet his title. New Domain Oil Gas Co. v. Gaffney Oil Co., 134 Ky., 792; LeMoyne v. Hays, 145 Ky., 415; Kentucky Coal & Timber Development Co. v. Carroll Hardwood Lumber Co., 154 Ky., 523.

In telling his story of his purchase Andrew J. Blair says his father made a division of his land between his three boys, Harry, Jesse, and Andrew, and kept some of the land for himself; that Andrew was to pay $250.00 therefor in corn, to be delivered at the rate of fifty bushels a year, at fifty cents per bushel; that he paid at that rate for twenty-four years, and for two years longer at the rate of twenty-five bushels per year. The last delivery of corn was, therefore, made in about 1905—the same year Andrew left the land and moved to Denver.

When asked if his father ever exercised any control over the land after the alleged sale in 1880, he says his father did not do so, but that he let his father cultivate truck patches on it whenever he wanted them. When asked why he kept on paying his father corn after he had fully paid $250.00 in corn, Andrew answered that he had never counted it up; that he wanted his father to have something to live on; that he asked his father for a deed after he had finished paying for the land, and his father answered, saying he could not make it, that "Mat," meaning Mrs. Rice, would have to make it.

Andrew has proved by several witnesses that he lived upon the land for more than thirty years—some of them saying he claimed to own it, others merely saying he lived on it. And when Andrew was asked when it was he first learned he could hold the land although his father had not given him a deed for it, he answered that he first learned of it just before this suit was brought, when his lawyers so advised him. Andrew's principal witness is William H. Johnson, a near neighbor, who was called in to act as arbitrator in a crop dispute between Andrew and his father.

Johnson testified that he met Andrew Blair and his father in a cornfield, at their request, and settled the dispute by giving John P. Blair one-third of the corn, according to a contract existing between them. That would indicate that Andrew was his father's tenant, "upon the shares," by which the landlord received one-third of the crop. Johnson further said that John P. Blair made a line about fifty yards below Andrew's house; and that on the land above that conditional line Andrew was to have all he could make, and for the land below the line he was to pay his father a third of the crop until his death, when the land should belong to Andrew.

The date of this settlement is nowhere shown; Johnson fixing it no more certain than by saying it was after John P. Blair's second marriage. It may have been after John P. Blair had made the deeds to his daughters, in 1892, more than twenty years ago.

John Conley, who lived on an adjoining farm, testified that he had heard Andrew claim the small piece of vacant land above referred to, but that John P. Blair was in control of the land in litigation, while he lived; and that since his death the appellant, George Rice, had control of it, with the exception of the little vacant piece at the head of the branch that Andrew lived on and controlled.

Conley further testified as follows:

"Q. Did you ever know of John P. Blair renting the land in controversy to any one while Andy Blair, the plaintiff was living on the head of the branch; and if so, when and to whom? A. Yes, sir; he rented it several years. I rented it some two or three years myself, and knew of Bascom Conley renting it; and I have known of plaintiff, Andy, renting it. Q. How did the plaintiff and the other parties pay the rent, and in what? A. They paid it in grain. They generally raised grain, oats, corn, etc. We paid one-third. In paying in corn we paid a third measured in sled loads, usually, and measured wheat by the bushel. Q. How often did the plaintiff rent this land of John P. Blair? A. I couldn't state the number of years, but several times. Q. Did you know of him paying the rent? A. Yes, sir."

In speaking of the arrangement between John P. Blair and his sons, for the land, Conley further testified:

"Q. What kind of arrangement did you understand from Harry that he had in reference to this land where he went to housekeeping? A. He was to take the land

and live on it and pay what rent he could afford to pay—something to that amount—and if he left, the land was to fall back to the old man. But if he lived on it, and paid the rent, it was to be his land. Q. Did you also understand that the plaintiff had the same kind of an arrangement about the land he moved on? A. I don't know that I did. Q. You did understand that the old man had divided up his land among his boys, did you not? A. Yes, sir; I understood that—furnishing them a place to live. Q. Did you understand that the plaintiff was also to pay for his land like Harry? A. Yes, sir; that was the same understanding."

When Harry moved off of his part of the land, Conley bought it from John P. Blair. When asked to restate the contract between John P. Blair and his sons, Conley testified as follows:

"Q. Under that arrangement, I believe, you state that the boys were to pay so much and were to live on the land, and if they failed to pay or moved off the land, they were not to have it. Is that correct? A. The land was to fall back to the old man when they moved off from it. Q. Did Harry move off and the land fall back, under that arrangement, to John P. Blair? A. Yes, sir. Q. Did the plaintiff move off of it in John P. Blair's lifetime? A. Yes, sir. Q. Did he pay rent to John P. Blair while he was off the land? A. No. Q. Who controlled this land, and who paid taxes on it, during all John P. Blair's lifetime? A. John P. Blair; up till the last two or three years before he died he listed it in George Rice's name. Q. Under the arrangement between John P. Blair and his three sons mentioned, who was to control the land in controversy during John P. Blair's lifetime, if you know? A. John P. Blair."

Martin Rice, introduced by Andrew, testified that he understood there was an arrangement between Andrew and his father, but he did not know what it was; that John P. Blair told him he intended Andrew should have the hollow, as he opened it up; although he never said upon what terms he was to have it.

Under this evidence, the chancellor granted Andrew J. Blair the relief he sought; and from that judgment Rice and wife prosecute the first appeal.

Eliminating the incompetent testimony of Andrew concerning his transactions with his father, who is now dead, it will be seen the agreement between them, at best, amounted to no more than a verbal promise to give

Andrew the land upon his father's death, and that instead of doing so, John P. Blair deeded it to his daughters. In no view of the case was Andrew's holding adverse to his father.

It is a general rule that when one enters into and holds possession of land under an executory contract of purchase, or bond for title, the entry and possession are in subordination to the title of the vendor until payment or performance of all the conditions by the vendee, or until the vendor has distinctly and unequivocally repudiated the title of his vendor, which repudiation is brought expressly or by legal implication to the vendor's knowledge. Chiles v. Jones, 4 Dana, 479; Kirk v. Taylor, 8 B. Mon., 262; Fowke v. Darnall, 5 Litt., 316; Henderson v. Dupree, 82 Ky., 674; 1 Cyc., 1044.

The reason for the rule forbidding a person who has gone into possession under a contract to purchase, to dispute the title of his vendor, is believed to be the same as in cases of landlord and tenant; namely, the injustice of allowing a person who has obtained possession by admitting the title of another, to enjoy that title, and, in case of failure of proof of it, hold the premises himself.

In 1 Cyc., 1047, it is said:

"The possession of a vendee under a parol executory contract of purchase is not adverse to that of his vendor until he has performed the conditions thereof or repudiated the latter's title.

"The possession of one who enters under a contract of purchase may become so far adverse that he will acquire title by limitation.

"The possession of one entering under an executory contract of purchase becomes adverse where he repudiates the title of his vendor, and he may acquire title by adverse possession by occupying the land for the statutory period after such repudiation. The repudiation, however, must be manifested by explicit and unequivocal acts brought home to the vendor's knowledge.

"While the law seems to be otherwise in some States, the decided weight of authority is to the effect that a vendee of land in possession under a contract of sale by parol, or in writing, holds adversely to his vendor from the moment of payment or performance of the conditions of the contract; and if this possession is continued for the statutory period, the purchaser acquires title by the statute of limitations.

"Tender of performance by the vendee in an executory contract of purchase has been held sufficient to start the running of the statute. Part performance, however, does not have such effect."

The distinction between an entry under an executory contract of sale and an entry under an executed parol sale, is recognized in New Domain Oil Gas Co. v. Gaffney Oil Co., 134 Ky., 800, where we said:

"Where a grantee under an executory contract for the sale of land looks to his grantor for title, it is generally held that he cannot, at the same time, claim that his possession was so adverse to his grantor as to defeat the latter's lien for unpaid purchase money. But where the vendee has paid for the land, and owes nothing to his vendor, his possession is hostile to any claim of superior title or right by the latter, and although a deed is not executed, the vendee could use his possession, after the statutory period, to defeat the claim of his vendor or any one else to right of possession because the paper title was vested in them. If the possession is hostile to any claim of right by the former owner, it is adverse to it, and sets the statute running, although the person in possession may be looking to the former owner for conveyance. Commonwealth v. Gibson, 85 Ky., 666, 4 S. W., 453, 9 Ky. L. R., 205; Thomson v. Thomson, 93 Ky., 435, 20 S. W., 373, 14 Ky. L. R., 513; Owsley v. Owsley, 117 Ky., 47, 77 S. W., 397, 25 Ky. L. R., 1186; Spradlin v. Spradlin, 18 S. W., 14, 13 Ky. L. R., 723."

Again, in Murphy v. Newingham, 151 Ky., 363, we further said:

"It is well settled that where there is an unconditional parol gift of a well-defined body of land, accompanied by an actual possession for 15 years or over, with claim of ownership, such possession ripens into title, and the donor cannot recover the land. If, however, one enters upon land by the owner's permission, expecting that the owner will give it to him, then such possession is not a hostile holding. Commonwealth v. Gibson, 85 Ky., 666; Thomson v. Thomson, 93 Ky., 435; Owsley v. Owsley, 117 Ky., 47."

The question, therefore, is, Did Andrew enter as a purchaser from his father, or as his tenant?

In our opinion, the evidence does not sustain the claim of Andrew J. Blair to be a purchaser. The fact that his father apportioned the land between his three sons, still keeping, however, the title and control in himself; his

renting out parts of it to different tenants, including his son Andrew, and collecting rent from them; the fact that Andrew paid rent for a portion of the land upon the same terms that other tenants paid; the fact that the annual payments consisted of only fifty bushels of corn, which was no more than a reasonable rent; and further that John P. Blair formally conveyed the property to his daughters in 1892 by a general warranty deed and referred Andrew to his sister when he asked for a deed, satisfies us that Andrew's possession was that of a tenant.

A great deal of the testimony is wholly incompetent; and stripping it of its incompetent features, the net result is that John P. Blair never parted with his title or possession, but that both were recognized by every one, including Andrew. Andrew's belated claim was never hostile to his father's ownership and possession. At most, Andrew's possession of the land, except the small vacant piece at the head of the branch, was merely permissive.

We are, therefore, of opinion the chancellor erred in sustaining Andrew's claim to that part of the land in question which lies on the branch below the vacant land, or below the line which runs down the branch at the lower end of the old orchard and crosses to the top of the hill. His claim should have been confined to the small vacant piece at the head of the branch.

2. After Rice and wife had prosecuted an appeal from the judgment in Andrew's original case above considered, they brought an action on October 24, 1913, for a new trial, upon the ground of newly-discovered evidence, which consisted of statements made by A. J. Blair to six or more new witnesses, whose names are given, to the effect that he only owned that part of the land lying at the head of the branch, which was only about one-half of the land described in his petition, and that he had no claim to twenty acres thereof. To this petition Andrew J. Blair answered, pleading that the original case was then pending upon appeal; and a demurrer to the answer having been overruled and the petition dismissed, Rice and wife prosecute the second appeal now before us.

This ruling of the chancellor was likewise erroneous, since it is well settled that a party who has been defeated in an action may prosecute an appeal and an action for a new trial at the same time, where the ground

upon which he seeks a new trial is one of which, as in the case at bar, he could not avail himself on the appeal. It was expressly so decided in Duncan v. Allender, 110, Ky., 828. The reason for the rule is manifest.

The judgment in each appeal is reversed and the cases remanded with instructions to enter a judgment confining Andrew J. Blair's relief to the vacant land at the head of the branch, and to dismiss the petition in all other respects.