## Collins, et al. v. Brown, et al.

(Decided May 15, 1925.)

### Appeal from Franklin Circuit Court.

1. Adverse Possession—Possession of Vendee Under Executory Contract of Sale Not Adverse Until Conditions Thereof Performed or Vendor's Title Repudiated.—Possession by vendee under an executory contract of sale including oral contracts is not adverse to that of his vendor, until he has performed conditions thereof, or repudiated latter's title.

2. Adverse Possession—Vendee Acquires no Title by Adverse Possession by Paying Taxes and Keeping Property in Repair.—A vendee under an executory contract of sale acquires no title by adverse possession, by merely paying taxes on property and keeping it in repair, as it will be presumed, in absence of proof to contrary, that his contract obligated him so to do.

3. Adverse Possession—Plaintiffs Held Not to have Established Title by Adverse Possession Through Their Ancestor.—Plaintiffs, claiming title to property by adverse possession through their ancestor, held not to have established title, where evidence showed that such ancestor acquired possession under executory contract of sale, and thereafter recognized executory nature of his obligation, by several times attempting to acquire a deed from heirs of his vendor, thus acknowledging title in such heirs.

LESLIE MORRIS for appellants.

MORRIS & JONES for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

In 1887 C. A. Johnson purchased from Owen Tinsley a tract of land containing 47 acres. He paid part cash, and for the balance gave his notes secured by vendor's lien. These notes were later assigned to Reuben Brown, and in 1894 Reuben Brown, in an action against C. A. Johnson and his then wife, Lucy Johnson, foreclosed the aforesaid lien. The property was duly sold at a commissioner's sale and Reuben Brown bought in the same for his debt, interest and costs. Before a deed could be made to him, however, he died, leaving surviving him as his only heirs at law six children, five of whom are the appellees herein and who are called in this record the Brown heirs. After a due revivor, the court ordered the commissioner to make a deed to the Brown heirs for

the property in question, and this the commissioner did by deed dated January 31, 1896, which deed was duly recorded. C. A. Johnson and his wife, Lucy Johnson, were divorced in the middle 90's. Two children were born of their marriage—Sam Johnson, and Anna Johnson, now Mrs. Anna Cardwell. After his divorce, C. A. Johnson remarried, and by his second wife, now Mrs. Delia Cook, had two children—Catherine Johnson, now Mrs. Catherine Weaver, and C. A. Johnson, Jr. who died about 1918 intestate, a minor and without children. C. A. Johnson himself died in 1901. After Mrs. Lucy Johnson and her husband separated, she and her two children, Sam Johnson and the present Mrs. Anna Cardwell, both of whom were then minors, continued to live in a house very close to the 47 acres hereinbefore mentioned. In fact these 47 acres abutted on the back yard of the premises on which their house was located. At the time the commissioner's deed was made to the Brown heirs in 1896 only one of them was then of age, he being the defendant, John Brown; and the youngest of these Brown heirs did not come of age until October 17, 1906. In 1896, Sam Tinsley, known in this record as Squire Tinsley, who was a brother to Mrs. Lucy Johnson, and who owned land surrounding on three sides, more or less, the 47 acres in dispute, entered into a contract or agreement with John Brown, who was acting as administrator of the Reuben Brown estate, looking to a purchase of these 47 acres from the Brown heirs. In July, 1897, John Brown filed a petition in the Franklin circuit court wherein he was plaintiff and his five infant brothers and sisters, the present appellees, were defendants, and wherein he stated to the court that he had this contract or agreement with Tinsley, that it would be for the best interests of the infant heirs to sell the land by private sale to Tinsley, and wherein he prayed the court to approve of such sale. This the court did by a judgment whereby he directed the commissioner of the court to execute a deed to Squire Tinsley upon the payment by him of the agreed purchase price, one-sixth thereof to each adult heir, of whom at that time there was but one, and one-sixth thereof to the guardian of each of the infant heirs, of which at that time there were five. It is conceded by the appellants that these proceedings were void in that they did not comply with the Code or statutory requirements neces-

sary to divest an infant of his interest in real estate. It appears that as the infants at that time had no guardian, Squire Tinsley did not pay the purchase price or at least that part belonging to the infant heirs as it was recited he should do in this judgment, and, therefore, he did not nor did he ever get a deed to the property in question. However, he went into possession of the property, paid taxes thereon thereafter, and from all the evidence in this case we are convinced that the actual possession of this property from 1896 until the institution or just before the institution of this action was in Squire Tinsley until his death in 1917, and thereafter in his heirs, the present appellants. It is true that during this time he permitted his nephew, Sam Johnson, to make a crop or two on this land, and, when it was not in cultivation, to pasture on it, and to take wood from it; but the evidence also shows that Squire Tinsley was very kind to his sister and his niece and nephew; helped them out in many ways, and permitted them to pasture on other lands of his and to take wood from other property he owned. We are convinced from the reading of this record that such possession as the Johnsons had of this property was sporadic, by permission of Squire Tinsley, entirely amicable to and under his possession and by virtue of his permission. In 1900, the suit brought by John Brown against his sisters and brothers was redocketed on motion of Squire Tinsley, and an order was then entered in that suit reciting the fact that no guardian had ever been appointed for these infant children and that the purchase money due them had never been paid. The order further provided that Squire Tinsley should pay over the unpaid purchase money to the commissioner of the court, who should hold it until the infants became 21 years of age, respectively, or until a guardian should be appointed for them, and that when these events had transpired and the money paid to such adult heirs or guardians as the case might be, the commissioner should then make Squire Tinsley a deed. It appears, however, that Tinsley never complied with this order, never paid the purchase money into court, nor, as stated, did he ever get a deed. In 1906 Tinsley made an effort to get his attorney to secure for him a deed from the Brown heirs, but nothing seems to have come from this. Again, in November, 1911, Tinsley prepared or had prepared another deed from the Brown heirs to himself for the 47

acres in question, in which deed it was recited that Tinsley still owed the sum of $110.00 on the purchase price, with interest from April 18, 1896. This deed was submitted to the Brown heirs but was signed only by John Brown and his wife, the widow of Reuben Brown and by one of the original infant heirs, now Bessie Cowan, and her husband. The other Brown heirs either neglected or refused to sign the deed. In 1920 the heirs of Squire Tinsley brought this suit against the heirs of C. A. Johnson to quiet their title to the 47 acres in dispute. It appears that at this time the Tinsley and Johnson heirs were both ignorant concerning any claim of the Brown heirs to the property in question, and neither the Tinsley nor Brown heirs knew exactly in what fashion Tinsley had secured his title or right to possession to the 47 acres in question. The case was fought out between the Tinsley and Johnson heirs purely on a question of title by adverse possession, each of them so claiming the property. After a great deal of proof had been taken, the facts surrounding the purchase by Tinsley from the Brown heirs came to light, and thereupon by amended petition the Brown heirs were made parties to this litigation. John Brown, who was a nonresident, was proceeded against by warning order. He has never appeared in this litigation nor taken any steps to protect any rights he may have. The five other Brown heirs filed an answer, counterclaim and cross-petition in which they asserted themselves to be the record title owners of the property in question to the extent of a five-sixths undivided interest therein, and asked that they be adjudged the owners of the land against both the Tinsley and Johnson heirs. The Tinsley and Johnson heirs then reasserted title in their respective selves by adverse possession against the Brown heirs. The lower court adjudged the Brown heirs to be the owners of a five-sixths undivided interest in the property; the Tinsley heirs to be the owners of John Brown's one-sixth interest; and that the Johnson heirs had no title to the property whatever. On this appeal, the Tinsley heirs are appealing from the judgment in favor of the Brown heirs.

As John Brown has prosecuted no appeal, the only question which confronts us in this case is whether or not the court correctly adjudged a five-sixths interest in this land to be the property of the five Brown heirs who appeared and defended. As hereinbefore stated, we

are convinced from the evidence in this case that the actual possession of this property from 1896 on was always in Squire Tinsley until he died, and thereafter in his heirs, and that such possession as the Johnson heirs had from time to time was in truth and in law Tinsley's possession. The question, then, as fairly stated by the attorneys for Tinsley, is whether or not Squire Tinsley had acquired title to this land by adverse possession against the Brown heirs. That he did not under the authorities in this state seems clear to us. It is a well settled principle that possession by a vendee under an executory contract of sale is not adverse to that of his vendor until he has performed the conditions thereof or repudiated the latter's title, and this is true though the contract is oral. Further, title by adverse possession is not obtained by the vendees merely paying taxes on the property and keeping it in repair, as it will be presumed in the absence of proof to the contrary that his contract obligated him so to do. This was so held in Butts v. Skinner, 202 Ky. 356, 259 S. W. 708; Creech v. Creech, 186 Ky. 149, 216 S. W. 127; and Rice v. Blair, 161 Ky. 280, 170 S. W. 657. The evidence in this case discloses that Tinsley in redocketing in 1900 the Brown v. Brown suit, recognized the executory nature of his obligation to the Brown heirs, and that title was still in them. He again recognized this in 1906, when he undertook to have his attorney procure for him a deed, and again in 1911, by preparing and submitting to the Brown heirs the deed of that date as hereinbefore set out, he clearly acknowledged and recognized the fact that title was then in the Brown heirs and that he owed them money on this purchase. It is true that the witnesses introduced by the Tinsley heirs say that from 1896 on Tinsley was in the possession of this property, claiming it against all the world; but it is very evident that they did know of all of the facts in this case, because Tinsley's own conduct in redocketing the case in 1900 and communicating with his lawyer in 1906, and preparing the deed in 1911 fully proves that he recognized that the title was in the Brown heirs, and that he still owed them money on his purchase of the property. We find nothing in the record to show that at any time did Tinsley bring home to his vendors the fact that he had repudiated their title, and his conduct, at least up to 1911, clearly bears out the

proposition that not only had he not repudiated it but that he recognized and acknowledged it. Hence, as the Tinsley heirs have not shown that their ancestor or their ancestor and themselves have obtained title to this property by adverse possession, and as it is agreed by all the parties hereto that no question will be made as to the title back of Johnson's deed in 1887, and as it appears that the record and legal title to this property is vested in the Brown heirs, and has not been divested from them by either the Tinsley or Johnson heirs, the lower court correctly adjudged that five-sixths of this property belong to the five named Brown heirs.

The judgment of the lower court is therefore affirmed.