# Cherry Bros. v. Tennessee Central Railway Company, et al.

(Decided November 25, 1927.)

## Appeal from Christian Circuit Court.

1. Estoppel.—Purchasers of property, who had deed recorded immediately after receiving it, held not estopped to deny alleged title of adverse claimant in possession, by failure to notify claimant of rights under deed.

2. Estoppel.—No estoppel, based on ignorance of records, arises where party claiming the estoppel is bound with constructive notice by public records.

3. Adverse Possession.—In action of ejectment against railroad claiming property in its possession, which it was permitted to use for station without actual grant or conveyance, evidence that original right of way of railroad was insufficient for its needs, and that it required additional strip so obtained, held immaterial on question of adverse possession.

4. Adverse Possession.—Where railroad acquired strip of property adjoining right of way for purpose of station under promise of owner without conveyance, entry was permissive and could never ripen into title until railroad did some act repudiating title of grantor, actual notice of which must have been brought home to grantor or successors in interest.

5. Adverse Possession.—Where entry into premises is amicable, possession of person so entering can never ripen into title in absence of repudiation of title of grantor, which must be brought home to grantor or successors by actual, and not constructive, notice.

6. Evidence.—In action of ejectment against railroad and another occupying land which railroad was permitted to use for station, oral testimony as to term of written lease from railroad introduced to prove adverse possession held improperly admitted because secondary evidence.

7. Evidence.—Where lease is of record, an official copy of it is best evidence obtainable.

8. Evidence.—In ejectment action against railroad to recover property which it had been permitted to use for maintaining station, admission in evidence of lease of property by railroad, introduced to establish adverse possession, held error, where no witness was introduced to establish execution of instrument or identify signatures of signers.

9. Trial.—In ejectment action in which two defendants relied on same defense, permitting one of defendants to testify in his own behalf after witnesses for codefendant had testified held not error.

10. Adverse Possession.—In action of ejectment against railroad and another claiming property by virtue of original entry by railroad thereon with owner's consent for purpose of erecting station, evi-

dence held insufficient to make issue for jury as to defendant's right to recover on ground of adverse possession.

11. Vendor and Purchaser.—Erection of building by adverse claimant on property purchased or on any portion thereof is notice to purchasers of claim of person erecting building.

12. Champerty and Maintenance.—If building is erected by adverse claimant on any portion of property subsequently sold, such subsequent deed is champertous as to that portion of property occupied by building and such further portion as builder claims adversely.

13. Champerty and Maintenance.—To render deed champertous, adverse possession need not have existed for any particular length of time, provided it did actually exist when deed was made.

14. Champerty and Maintenance.—In ejectment action against railroad and another, question whether railroad's lessee erected building on part of premises rendering deed champertous for adverse possession held for jury.

SELDEN Y. TRIMBLE and McKENZIE & SMITH for appellants.

J. W. DOWNER and FRANK RIVES for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The appellants, whom we shall refer to as Cherry Bros., were unsuccessful in an ejectment proceeding which they began against the Tennessee Central Railway Company, which we shall refer to as the Tennessee Central, and C. E. Southall, whom we shall refer to by name. In 1903, the railroad now owned by the Tennessee Central, was built from Nashville, Tenn., to Hopkinsville, Ky., and crossed in almost a north and south direction the farm of Mrs. Annie McKee. When the railroad was built, a public road was soon thereafter opened along the northern line of Mrs. McKee's property, crossing this railroad at practically a right angle, which is now known as the Pembroke road. Mrs. McKee and her trustee, Planters' Bank & Trust Company, of Hopkinsville, Ky., conveyed to the Tennessee Central a strip of land 100 feet in width entirely across her farm, upon which its railway was constructed and has since been maintained. We have examined the deed from Mrs. Annie McKee to the Planters' Bank & Trust Company, creating this trust, and find that by this deed she conveyed this farm to them during her life, with the power to rent, manage, and look after the property generally, and also with power to sell it, but that power to sell was

not an exclusive power, and on May 17, 1905, there was recorded in the Christian county clerk's office a deed by which she conveyed this property to Sara H. McKee, Elizabeth McKee, and Carrie M. Roper, retaining a life estate. The opening of this Pembroke road, the needs of the community, and the desire of the Tennessee Central to get business suggested the establishment of a station in this neighborhood. Just across the Pembroke road from the land of Mrs. McKee was the farm of Richard Leavell. After the railroad was constructed, the Tennessee Central began to stop its trains at this road crossing, and gave to this stop the name of Pierceton. The people thereabout were sanguine enough to expect that a village would soon spring up there. Mrs. McKee was a daughter of Fidelio Sharp, who had been a distinguished lawyer in western Kentucky. She desired to have the stop named Fidelio, in honor of her father.

The railroad company desired some additional ground for depot purposes. There was some question as to whether this station should be placed south of the Pembroke road, upon the McKee property, or north of it on the Leavell property.

Mr. T. R. Troendle, a witness for Cherry Bros., testified that he was present at a conference held one summer day in 1903 in Mrs. McKee's front yard between Mr. John Russell, the local counsel for the road, Mrs. Annie McKee, her son, Sam McKee, and Mr. D. R. Carpenter, who was then right of way agent for the Tennessee Central. This is taken from his evidence:

"The conference was for the purpose of acquiring from Mrs. McKee an additional strip of land, more than the original right of way that they secured when the railroad was projected. Up to that time there had been considerable of a controversy in reference to where the depot should be built, and what the depot and what the station should be named. They objected to the name that it then had, and also objected to Dick Leavell having it named 'Leavell.' I believe at that time, right when this meeting was held, Leavell had succeeded in having the name changed to that of 'Leavell,' and I went to Nashville to see Mr. Newell, the president of the Tennessee Central; went all the way from Chicago on purpose to have them change it to

Fidelio, in memory of Colonel Sharp, who owned, originally, all that land around there. Mr. Newell agreed to change it, and for the purpose of locating a station there Carpenter, Russell, and I went out there to see Mrs. McKee about securing additional land.

"Mrs. McKee declined to make any price, but agreed that, as long as Sam was agent, as long as the depot was maintained there, and when it was named Fidelio, in honor of her father, an additional strip, for the convenience of the depot, might be used; but positively declined to name any price or to sell it."

All of the other parties at that conference are dead except Mr. Carpenter, and he testified that no such conference was ever held. The station, which is a flag station, was established immediately in front of Mrs. McKee's home, and probably about 100 yards therefrom, and a strip of ground was left open adjoining the 100 feet of right of way 50 feet in width from the southern line of Mrs. McKee's property for a distance of 1,136 feet, when it reached a point in front of her yard, and from there on to the Pembroke road, a distance of 305 feet, this strip that was left open, was 80 feet wide. Mrs. McKee's yard fence was thus 30 feet farther from the railroad than the fence which separated her horse lot and other property from this strip of ground, and it is this strip of ground that is in dispute.

The Tennessee Central, in its answer, charges that in 1903, or soon thereafter, its predecessor, the Tennessee Central Railroad Company, purchased under an oral and verbal contract and agreement, from Mrs. Annie McKee, for depot grounds and purposes at Fidelio, the strip of ground in question, that it was put in full and complete possession of the property by Mrs. McKee under an agreement from her to execute to the Tennessee Central a valid, legal conveyance thereof, and that thereupon its predecessor took possession of all said property, and that the Tennessee Central and its predecessor in title have since that time held, used, and owned the same, and had the open, notorious, continuous, peaceable, undisputed, actual, and adverse possession thereof, claiming to hold and to own the same, to the exclusion of every one else, and have since so held and used same, without objection or molestation from any source.

The Tennessee Central admits in its answer that for some reason not known to it the said conveyance was never made. This strip of ground as well as the right of way of the railroad company was thrown open. Mrs. McKee used it in going from her horse lot to the Pembroke road and other parts of her property. The public used it in coming to her home and to her property, and also in coming to the railroad station. The front gate of Mrs. McKee's yard opens on this strip of ground. She used it every time she came out that gate. . Her stables and lots were connected with it by a yard gate, and she and her tenants used it in going to and from her stables. She had a barn a little farther south, of which the same is true. She had a field west of the railroad tracks and in order to reach that field, from her house, stable, or barns, she drove out on to this disputed strip, then drove down the strip to the southern end of it, where she crossed the railroad to her west field. This strip was her outlet to the world and her inlet therefrom to her home and improvements. There is some evidence that she cultivated this strip or a portion of it in tobacco and potatoes, but there is also evidence disputing this. There is evidence that brush and other obstructions were placed on this strip by her son, Sam McKee, to compel the public to confine its use to the 100-foot right of way, and there is evidence from farmers who were delivering produce there that they were directed by Sam McKee to keep on the 100-foot strip, and to stay off of this disputed strip.

A switch or side track was constructed, and instead of being built alongside, near and parallel to the main track, it was constructed in a bow shape, so that in the middle of it the center of this side track was more than 50 feet from the center of the 100-foot right of way, and a small portion of this side track was thus on the disputed strip. No depot or other station facilities were erected by the railroad company except a sort of shed for loading and unloading tobacco and a chute for loading cattle; the whole of this shed was on the disputed strip, also a portion of the cattle chute was on it, and a portion of it was on the 100-foot right of way.

Mr. Sam McKee and the other farmers in the neighborhood made up money among themselves, bought and installed a wagon scales on this strip in dispute. Those scales were used by these farmers for weighing their produce, and Mr. Sam McKee used them for weigh-

ing cattle and other produce which he bought and shipped at that station. Sam McKee died in 1908, and Mrs. Annie McKee died a few weeks thereafter.

The Tennessee Central and Southall contend that in 1909, Mr. T. R. Troendle obtained a lease from the Tennessee Central and constructed a storehouse, the larger part of which was on the 100-foot right of way, but a portion of which may have been on this disputed strip; that storehouse has now been moved, and the witnesses seem to be unable to definitely fix its former location. The shed provided for loading tobacco has dropped into decay, and that is gone. The scales installed by the farmers wore out and new scales have been constructed at a different place, but still on this disputed strip. The farmers erected the new scales, but this time the railroad contributed to their erection.

After his storehouse was constructed Mr. Troendle became and for some years continued to be the local agent of the Tennessee Central. The appellee Southall operated a country store in Mr. Troendle's building, and acted as a railroad agent for Mr. Troendle in his absence; but in 1914, he leased from Richard Leavell an acre of ground on the north side of the road, and built a storeroom of his own thereon, and left the Troendle storehouse vacant. Soon thereafter Southall succeeded in getting himself appointed agent for the Tennessee Central. The stopping place was moved across the Pembroke road to the north side thereof, where some sort of platform was made for the convenience of the passengers, and an old freight car was installed for baggage and freight room, the Southall storeroom being used for a waiting room.

Mrs. McKee's will was probated on August 17, 1908, but her trustee seems to have continued to manage and control her property until January 18, 1919, when it relinquished same to the heirs of Mrs. Annie McKee, and by deed recorded that date those heirs conveyed this property to Douglas Bell, who on the next day conveyed it to Cherry Bros. by a deed which was immediately recorded.

In the year 1924, Troendle moved the storehouse which he had built, and after he had begun moving it this storehouse was sold to Cherry Bros., who relocated it just west of the front yard of the McKee property, and on this disputed strip. Thereupon the appellee

Southall claims to have secured some sort of a lease from the Tennessee Central, and on November 24, 1924, he moved the storehouse which he had built on the Leavell property across the Pembroke road and relocated same on the south or McKee side thereof, and 8 feet of that house is on this disputed strip and the remainder is on the 100-foot right of way. He has also built a residence south of this store, 22 feet of which is on this disputed strip, and the remainder is on the 100-foot right of way.

T. B. Cherry was sick at that time, and on November 30, 1924, G. C. Cherry came to see his brother and on his way he passed this station and saw that Southall had moved over and, as he says, "occupied his property." The next day he gave Southall some sort of a notice to vacate, the notice not being in the record. At that time Southall had completed the moving of his storehouse and had begun work on his dwelling, which work he continued, and on December 16, 1924, Cherry Bros. began this action, seeking to eject the Tennessee Central and Southall from the strip in question. In addition to its plea of adverse possession, the Tennessee Central in its answer alleged that it had such possession, at the time that Cherry Bros. bought this property in 1919, and that, therefore, their purchase was champertous. Southall, in his answer, in addition to pleading adverse possession and champerty as the railroad had done, also pleaded an estoppel, alleging that Cherry Bros. knew of his intention to move his storehouse on to this land and to erect his dwelling thereon, and that they allowed him to do so without claiming any ownership of it or questioning his right to do so.

Cherry Bros., by elaborate replies to the answers, categorically denied each and every affirmative allegation in them. There are three questions presented by this record. (a) The question of adverse possesison and title by prescription. (b) The question as to whether or not the deed from Judge Bell to Cherry Bros. was champertous. (c) Have Cherry Bros. by their silence estopped themselves as against Southall? We shall dispose of the estoppel first. Conceding the truth of everything Southall claims, he failed to sustain this plea for, as we have stated, the deed from Bell to Cherry Bros., conveying them property, including this strip, was then of record, and if they had gone to

Southall and told him it was their property and that he must not move on to it, and had then shown him their deed, and had him read it in the presence of witnesses, they could not have brought home to him notice of their rights any more effectually than they had done, when, after receiving their deed, they immediately took it to the clerk's office, and there had it solemnly recorded in the manner and at the place by the statute provided, for "No estoppel arises . . . where the party claiming the estoppel is bound with constructive notice by the public records." 21 C. J. 1156; Salyer's Gdn. v. Keeton, 214 Ky. 643, 283 S. W. 1015; Saylor v. Kentucky-Cardinal Coal Corp., 205 Ky. 724, 266 S. W. 388, 50 A. L. R. 666; Snyder v. Vinson, 167 Ky. 332, 180 S. W. 774; Farra v. Adams, 75 Ky. (12 Bush) 515.

We shall now discuss some of the errors complained of and then return to the other questions. The first is that the court allowed the defendants to show by a number of witnesses that the 100-foot right of way was not sufficient for the needs of the Tennessee Central, and that it needed this additional strip. No matter how great the Tennessee Central's needs may have been, such necessity, however great, could never give it title to one inch of this property. This evidence should not have been admitted. It admitted that no conveyance had ever been made to it for the strip, but pleaded it had purchased same and had taken possession without obtaining a deed. If that was true, then its entry was amicable, and its possession thereunder could never ripen into title, for in Collins et al. v. Brown et al., 209 Ky. 77, 272 S. W. 44, we said:

"It is a well-settled principle that possession by a vendee under an executory contract of sale is not adverse to that of his vendor until he has performed the conditions thereof or repudiated the latter's title, and this is true though the contract is oral."

It was further held in this case that notice of this repudiation must be brought home to the vendor. To the same effect is Butts v. Skinner, 202 Ky. 356, 259 S. W. 708; Blair v. Meade, 192 Ky. 720, 234 S. W. 433; Creech v. Creech, 186 Ky. 149, 216 S. W. 127; Rice v. Blair, 161 Ky. 280, 170 S. W. 657; Hamilton v. Taylor, Litt. Sel. Cas. (16 Ky.) 444; Doe on dem. Riley v. Million, 4 J. J.

Marsh. (27 Ky.) 395; Sprigg v. Albin, 6 J. J. Marsh. (29 Ky.) 158.

There is no suggestion by the Tennessee Central that it has performed the conditions of this purchase, nor does it even say what those conditions were, so we shall proceed to determine whether or not the Tennessee Central has repudiated the title of the McKees. All the acts of the Tennessee Central, such as building its track on a portion of this property, building the loading shed that is now gone, and building the stock chute, were all perfectly consistent with a permissive possession. All those things could have been done under its permissive entry without affecting Mrs. McKee's title, and thus it became necessary for the Tennessee Central, if it hoped to succeed, to show that it had done some act that was hostile to the title of Mrs. McKee, and that she or her successors in title had not constructive, but actual, notice of it. Therefore it sought to establish that the Tennessee Central has leased a portion of this disputed land to T. R. Troendle. It introduced one of its conductors, and he was improperly allowed to testify that this property was leased to Troendle by the Tennessee Central for a period of 10 years. As it was admitted this lease was in writing, the best evidence of it would be the writing itself. For the same reason, Southall and Carpenter should not have been permitted to testify about this lease, and the motion of Cherry Bros. to exclude this evidence should have been sustained. Cherry Bros. had asked Troendle about this lease when he was on the stand, and the defendants objected. The record does not show the ruling of the court on that objection, but the objection should have been sustained. Troendle stated that his lease was of record. If that was true, an official copy of it was the best evidence obtainable.

The Tennessee Central and Southall introduced another witness who was asked if he had the original lease executed by the railroad company to Troendle. He said he had. He was then asked by whom that paper was signed and he answered, "By The Tennessee Central Railroad Company, per A. B. Newell, President, and by Theodore R. Troendle." In brief for Southall it is stated that Carpenter testified that he was familiar with the signatures of both Troendle and Mr. Newell; but we have been unable to find that testimony in the bill of evidence. A better observation of section 2 of rule 5 of

this court would perhaps have enabled us to find this evidence, or else have enabled Mr. Southall's counsel to know that it did not exist. He was then improperly permitted, over the objection of the plaintiffs, to read this lease in evidence. No witness was introduced to establish the execution of this paper by either the railroad company or Troendle. No witness testified to having seen it signed, or even that he knew the signatures of the signers and that they were genuine, and no witness offered to say that this was the lease under which Troendle erected his building. Troendle testified that his lease was recorded, whereas this one appears not to have been recorded. The paper does not authenticate itself, and, unless its execution by these parties was established in some way, it should not have been admitted. Moreover, this lease covers a strip of ground 150 feet long by 50 feet wide, of which a strip 20 by 150 feet on the east side thereof would be within the disputed strip, whereas Troendle testifies that his lease covers no part of the disputed strip, but was confined to the 100-foot right of way. Southall should not have been permitted to testify about the lease he had with the railroad company. It appears that that lease was a written document. He had it in his possession, and that writing was the best evidence of its contents. It was the very basis of all of Mr. Southall's rights.

There were two defendants, the Tennessee Central and Southall. The defendant Tennessee Central called four witnesses who testified for it, and inasmuch as it and Southall were making the same defense, Southall necessarily got the benefit of their testimony. Southall then offered himself as a witness in his own behalf, whereupon Cherry Bros. objected. The court properly overruled their objection. Southall had introduced no witness in his own behalf. He could not prevent the Tennessee Central from introducing witnesses in its behalf. Necessarily one defendant had to introduce proof before the other.

We will now return to the question of title by prescription and the plea of champerty, and if we accept the Tennessee Central's account of its entry as the correct one, then its entry was permissive and, being so, it could never ripen into title until the Tennessee Central had, by some act, notice of which was brought home to Mrs. McKee or her successors in title, repudiated their title,

and had thereafter held the land for the statutory period. There is no such proof in the record; therefore the court should have directed the jury to find for plaintiffs on that branch of the case. There was proof that on January 1, 1910, T. R. Troendle secured a lease on some property at Fidelio; there was some suggestion that this lease covered a portion of this disputed strip and erected a building thereon. Troendle's building was standing on this location when Cherry Bros. bought this property, and if any portion of this building was on this disputed strip, that was notice to Cherry Bros. of his claim, and by inquiry they could have ascertained the extent of his claim, and if any portion of this building was on this disputed strip, then the deed to Cherry Bros. is champertous as to all that portion of this strip so occupied, and such further portion as an inquiry of Troendle would have disclosed he was claiming to have a right to use, for an adverse possession merely has to exist to render a deed champertous. It does not have to have existed any certain length of time. Upon the question of champerty, the question is not how long has the adverse possession continued, but did it actually exist when the deed was made? How the jury should be instructed is illustrated in the case of Mayes v. Kenton, 64 S. W. 728, 23 Ky. Law Rep, 1052.

Under the proof in this case, there was only one question to be submitted, and it should be submitted in one instruction drawn as indicated in the Mayes case.

The judgment is reversed.