## Piney Oil & Gas Co. v. Scott et al.

(Decided Nov. 2, 1934.)

53

COMBS & COMBS and T. H. HARMAN for appellant.

W. A. DAUGHERTY for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

Piney Oil & Gas Company, H. Langdon Laws, and Stuart B. Sutphin, for the purpose of quieting their title to the minerals, oils, gases, and certain rights of way in and appurtenant to what we call the "Gearheart Land" in Floyd county and to obtain injunctive relief against interference with their exploitation and enjoyment thereof, on August 31, 1931, filed its petition in equity against Katherine Scott and 51 others. Their petition was dismissed, the defendants were adjudged to be the owners of the minerals to which plaintiffs had asserted title, and the plaintiffs have appealed.

On December 16, 1859, Valentine Gearheart and wife conveyed to James H. Laws the minerals underlying and appurtenant to a particularly described tract supposed to be 800 acres or more in Floyd county, and on December 24, 1859, after due acknowledgment, this deed was recorded in the proper office.

No right of any kind was by this deed left in the grantor to use or enjoy these minerals in any way. Valentine Gearheart continued to occupy and reside upon the surface of this tract, and it appears that neither he nor any of the defendants ever took that deed very seriously, for upon March 20, 1880, he conveyed 40 acres of this tract to Judith Hutton without making any exception of the minerals he had conveyed to Laws. He continued to live upon the tract until his death in 1881, and his widow resided there until her death in 1900, whereupon his son, Jonathan Gearheart, following in the footsteps of his father, on August 27,

1900, conveyed to Ned Gearheart the one-third of this tract which he Jonathan had inherited from his father, by a deed containing a clause of general warranty, without making any exception of the minerals conveyed to Laws. On February 26, 1901, Ned Gearheart, Polly Mead (nee Gearheart), and Sallie Crabtree (nee Gearheart) executed partition deeds among themselves, which also contained clauses of general warranty, but no exceptions of the minerals, and that is true of all the divers deeds subsequently made by them and their vendees and appearing in this record. They and their vendees have also between 1895 and 1920 executed a number of oil and gas leases that appear in this record with like warranties of title but without exceptions of the minerals previously conveyed to Laws. The evidence indicates, however, these leases were soon abandoned and no drilling ever done under them, due, probably, to the discovery of the deed to Laws when the titles were examined.

On July 20, 1905 a general warranty deed without exception of the minerals was made by Sallie Crabtree et al. to L. Dow Scott for 40 acres of this land, and on May 28, 1913, he filed suit against Harry L. Laws, the only son and heir of James H. Laws, to quiet the title Scott asserted to the minerals under that 40 acres. That litigation reached this court and resulted adversely to Scott, as will be seen by reference to Scott v. Laws, 185 Ky. 440, 215 S. W. 81, 13 A. L. R. 369.

The record of that suit was made a part of this one both by pleading and by introduction in evidence.

In that suit Scott had asserted an adverse possession by himself and his grantors of both 15 years and 30 years, and had in his pleading alleged:

"He and those under whom he claims have at different times in each year mined and carried away large quantities of coal and have denied the right of all the world to mine thereon, have mined said quantities of coal to the exclusion of all the world and have so mined same openly, notoriously, adversely and peaceably and have at all times during said period claimed the whole of said tract of land including the coal and mineral thereunder as their own."

George Mead, one of the defendants in this case, admits

he contributed money to aid Scott in the prosecution of that old case, and, after the mandate was filed the court on February 10, 1920, entered a judgment quieting the title of Laws and describing with meticulosity the entire tract which had by survey been found to contain 962.8 acres.

The testimony in this case shows that old suit was intended as a test suit, but, as the test proved to be unfavorable to the surface owners, they elected to not abide by it, or, as Mr. George Mead says in his testimony in this case in answer to why he and others did not sue to quiet their title at that time:

> "We just thought there would be no use for anyone else to sue; that would look reasonable but we didn't get a square deal as we considered it and we never was satisfied with the decision of the court, of the Circuit Court or the Court of Appeals and we looked all the while for this opening we have now."

As to Geo. Mead, who admits participation in that suit by contributing to the attorney's fees and all claiming under him, and as to Katherine Scott and other defendants who claim under L. Dow Scott, the judgment entered on February 10, 1920, is conclusive, for in Bridges v. McAlister, 106 Ky. 791, 51 S. W. 603, 605, 21 Ky. Law Rep. 428, 45 L. R. A. 800, 90 Am. St. Rep. 267, we said:

> "Neither the benefits of judgments on the one side nor the obligations on the other are limited exclusively to parties and their privies. * * * There is a numerous and important class of persons who, being neither parties upon the record nor acquirers of interest from those parties after the commencement of the suit, are nevertheless bound by the judgment. Prominent among those are persons on whose behalf and under whose direction the suit is prosecuted or defended in the name of some other person."

Now to return to the other defendants. All the defendants were not sued originally, and some were brought in by an amended petition, and hence there are two answers in the record, one filed by the group first sued, the other by the group brought in by the amended petition. These answers are essentially the same. Each

consists of four paragraphs; the first is a denial; the second a plea of 15 years of adverse possession; the third a plea of 30 years' adverse possession; and the fourth is a plea that, at the time plaintiffs acquired their title, the defendants were in adverse possession of this mineral estate, and that hence the title of plaintiffs is champertous and void. All of this was put in issue by reply.

H. Langdon Laws and Stuart B. Sutphin acquired their interests in the premises by deed dated December 31, 1919, and the Piney Oil & Gas Company acquired its interests from them by lease dated August 9, 1929.

### Possession by Surface Owners.

After the deed from Valentine Gearheart to Laws had been recorded in the proper office, it brought home to all the world and to each of these defendants notice of the ownership by Laws of the minerals appurtenant to this "Gearheart Land" just as fully as if Laws had a notice of his ownership with a copy of this deed attached served upon each of these defendants by the sheriff and caused such copy to be read to them by him in the presence of witnesses. Cherry Bros. v. T. C. Ry. Co., 222 Ky. 79, 299 S. W. 1099.

From and after the recording of that deed, Valentine Gearheart, as the owner of the surface and all of these defendants claiming under him, became, were, and have remained trustees for Laws and those claiming under him. "The owner of the surface is regarded as trustee, in possession of the mineral for the use and benefit of its real owner, and he cannot acquire title by adverse possession to the mineral estate except in the way and manner which a trustee of other real property may acquire title against the cestui que trust. He is subject to all the rules controlling other trustees in possession." McPherson v. Thompson, 203 Ky. 35, 261 S. W. 853, 854; to same effect see Eli v. Trent, 195 Ky. 26, 241 S. W. 324; Foxwell v. Justice, 191 Ky. 749, 231 S. W. 509; Farnsworth v. Barrett, 146 Ky. 556, 142 S. W. 1049; Asher v. Gibson, 198 Ky. 285, 248 S. W. 862; Franklin Fluorspar Co. v. Hosick, 239 Ky. 454, 39 S. W. (2d) 665. Being trustees in possession, Valentine Gearheart and these defendants holding this surface under him could never, no matter how long they held this surface, by that possession disseise Laws

and those claiming these minerals under him. See C. J. p. 907, sec. 447; 65 C. J. p. 531, sec. 278; Ky. Stats. sec 2366a-1. Being trustees in possession, they could not while that relation continued ever be in adverse possession of these minerals. A trustee in possession while such can never acquire title to the property of his cestui que trust by any length of possession, for his possession never becomes adverse. See Elliott v. Louisville, 123 Ky. 278, 90 S. W. 990, 28 Ky. Law Rep. 967; Green v. Otter, 3 B. Mon. (42 Ky.) 102; Spicer v. Holbrook, 66 S. W. 180, 23 Ky. Law Rep. 1812; 65 C. J. p. 531, sec. 278. So long as these surface holders occupy the position of trustee in possession, their mining of coal on this land from time to time can never become such an adverse use and occupation as to amount to adverse possession. To acquire such a possession, they would have to openly disavow or repudiate the trust and give to the owner of this mineral estate notice thereof, or as said in Houser v. Christian, 108 Ga. 469, 34 S. E. 126, 75 Am. St. Rep. 72:

"We think that the grantees in a deed which reserved the mineral interests in the land conveyed to them cannot, as against the grantors or their privies, set up title by prescription to such mineral interests, unless they have in some manner given notice to the grantors or their privies that they intended to hold, or were holding, adversely to them. * * * Until after notice of such a claim, the possession as to the mineral interests is merely permissive, and the mere holding of the land for any number of years will not ripen into a prescriptive title where the possession is only permissive. * * * Having received the deed with a reservation of the mineral interest, and having given no notice of any adverse holding, the defendants are estopped to set up any prescriptive title to the mineral rights."

That was a case where the owners of the surface were grantees from the owner of the entire estate, and where the grantor of the surface excepted the minerals and reserved them to himself.

A grantor never occupies as good a position as a grantee, for a grantor may not derogate from his own grant; hence we should not be surprised to find this which is taken from 2 C. J. p. 143, sec. 246:

"By the execution and delivery of a deed of land the entire legal interest in the premises vests in the grantee, and if the grantor continues in possession afterwards his possession will be that either of tenant or trustee of the grantee. He will be regarded as holding the premises in subservience to the grantee, and nothing short of an explicit disclaimer of such relation and a notorious assertion of right in himself will be sufficient to change the character of his possession and render it adverse to the grantee."

A general warrantly deed conveying real estate is just about as solemn an instrument as the average man ever has occasion to execute. It must not only be in writing, in proper form and signed by the grantor, but he must acknowledge it before an officer who must make and sign official certificate thereof thereon, and it must then be delivered to the grantee before it becomes effective.

Where the law requires such solemnity in the execution of an instrument, we would naturally expect to find a grantor would not be permitted to lightly disregard it, and we do.

### Grantor's Possession after Conveying Whole Estate.

In Smith v. Phillips, 9 Okl. 297, 60 P. 117, it was held that the general rule that open, notorious, unequivocal, and exclusive possession of real estate, under an apparent claim of ownership, is notice to the world of whatever claim the possessor asserts, does not apply to the vendor remaining in possession, so as to require a purchaser from his grantee to inquire whether he has reserved any interest in the land conveyed.

In Warner v. Page, 4 Vt. 291, 24 Am. Dec. 607, a grantor after conveying by general warranty put a third party in possession, and it was held that the grantor in so doing may be presumed to have done so as the agent of the grantee, and that the posession of such third party will inure to the benefit of the grantee.

In Patterson v. Johnson, 255 Ala. 401, 143 So. 560, it was held that a grantor so remaining in possession acquired no title thereby, in the absence of a showing title conveyed had been repudiated and knowledge

thereof brought home to the grantee, and that grantor's possession is presumed to be in subservience to, and in recognition of, the title conveyed.

The same was held in Hogan v. Egyptian Portland Cement Co., 257 Mich. 381, 241 N. W. 129, and the court said that, before a grantor could claim adversely to his grantee, there must be an absolute disclaimer of rights of grantee and notorious assertion of title in himself.

Similar holdings may be found in Alabama Power Co. v. Rodgers, 222 Ala. 571, 133 So. 584.

We have similar cases in this state; for example, see Halbert, etc., v. Maysville, etc., R. R. Co., 98 Ky. 661, 33 S. W. 1121, 17 Ky. Law Rep. 1225, where the heirs of a grantor were held to have acquired no title by 32 years of occupancy. In Rudd v. Monarch, 32 S. W. 1083, 1084, 17 Ky. Law Rep. 893, Rudd had had possession for 16 years, yet the court said:

"The conclusions of law as announced by the court are, in substance, that plaintiff's possession of the land in contest was not adverse, and that his deed of warranty to same estopped him from claiming the same, and that defendant was in legal contemplation in possession of the land in contest from the date of the conveyance by plaintiff."

In Carpenter v. Carpenter, 8 Bush (71 Ky.) 283, a grantor had remained in possession for 16 years, yet this court said:

"Any title acquired by Jones after the execution of this deed would inure to the benefit of his vendee, the appellee, and the grantor is estopped, after the execution of this deed and the agreement to hold, as he himself proves, from setting up an adversary title."

The reason underlying these holdings is, such possession lacks the element of hostility. Having conveyed by a deed of general warranty, a grantor who asserts title in himself to any portion of the premises granted is to that extent attempting to derogate from his own grant which he is estopped to do.

A vast number of other cases wherein would-be disseisors have failed because their possession lacked

the element of hostility may be found in note 15 L. R. A. (N. S.) page 1192 et seq.

## Grantor's Possession after
## Conveying Minerals.

A grantor who conveys only the mineral underlying or appurtenant to his land is in a far less favorable position than those grantors of the whole estate that we have just considered.

Let us note that Valentine Gearheart by this conveyance to James H. Laws not only severed the ownership of the mineral estate in and appurtenant to this land, which ownership he had theretofore, but Laws had thereafter, from his ownership of the surface which he retained, but he also imposed upon himself and those holding this surface under him, a trust for the benefit of Laws and those holding under him. His position thereafter would not have been different if he had in this deed solemnly said:

"I hereby covenant and bind myself and those claiming under me that as owners of this surface we shall for you or those claiming under you, maintain possession of the granted minerals which necessarily must remain in our possession as trustees until you or those claiming under you shall begin the mining thereof."

This is a most serious handicap upon a would-be disseisor. Gearheart and those claiming under him were not thereafter in as good a position to initiate a disseisure as would have been a stranger. All a stranger would have to do would be to begin the necessary steps to accomplish the disseisin and perfect them, but, before any of these surface owners could become a candidate for the position of disseisor, it would be necessary for him to rid himself of his present position of trustee in possession. What these surface owners must do to remove such a disqualification is thus stated in Perry on Trusts (7th Ed.) sec. 864:

"If a trustee repudiates the trust by clear and unequivocal acts or words, and claims henceforth to hold the estate as his own, not subject to any trust, and such repudiation and claim are brought to the notice or knowledge of the cestui que trust in such manner that he is called upon to assert his

equitable rights, the statute will begin to run from the time that such knowledge is brought home to the cestui que trust, and he will be completely barred at the end of the statutory period. * * * To enable a trustee, without giving up the possession, to turn it into an adverse holding against the cestui que trust, the evidence must be clear and unmistakable, and such adverse claim must ·be brought home to the cestui que trust beyond question or doubt.''

## What They Have Done.

No formal notice has ever been given to the owners of these minerals by anyone. Many of these defendants have done nothing and the mineral estate under their properties has never been disturbed. As to these, there endeth the discussion. To use a homely expression, this is a case where every tub must stand on its own bottom. Any mining done by one defendant on the tract he claims can be of no avail to another defendant owning a separate and distinct part of this ''Gearheart land,'' yet this case was practiced in the trial court and judgment rendered there as though the operation on any of the many tracts into which this ''Gearheart land'' has been divided was an operation on all of them, which of course is erroneous.

The most extensive operation is upon the Geo. Mead land, but, as we have already disposed of the rights of Geo. Mead and those claiming under him, we will say nothing more of it.

The next operation in point of extent is upon a tract of 250 acres more or less acquired by Lack Salisberry February 23, 1923. He says that at a dozen or more places on his land the coal had been worked for 25 years or more when he got it, but these openings have been abandoned and the hillsides have slipped down and covered them, and he has made two new openings and has mined coal not every day and possibly not every week, but that he has tried generally to keep coal out so that a man could get in at any time. He says they make an opening go as far as they can safely, then abandon it and open another, that he was raised near here, and this has been going on since he could first remember, and he is 50 years old. We cannot better express the ideas these defendants have of

their ownership than to quote what Mr. Ad Scott says he told the men employed by the Piney Oil & Gas Company when they started to come onto his land: "I told them when they came on mine that I owned it sky high and hell deep and dared anyone of them to come on it." From that time at least it must be said Mr. Scott took a definitely hostile attitude regarding his 20 acres. He is not mining on his land, but says there is a place on it where coal was mined before he got it.

### The Mines in Question.

We think it well to say something of these mines; they are small affairs; they begin at the outcrop where the same has been exposed by the action of the elements; the mining is continued; and they go in 150 or 200 feet until the air gets bad, then new openings are made, etc.

There is evidence that such operations are conducted all over the coal region of Southeastern Kentucky. The coal companies who own this coal do not object to it, so testifies the chief engineer of the Elkhorn Coal Corporation which owns over 175,000 acres of coal, the general manager of the Big Sandy Company, which owns over 56,000 acres, the engineer of the Kentland C. & C. Company, which owns 80,000 acres, etc.

The reason these witnesses assign for allowing these small mines to exist is that the coal taken is outcrop coal that has no commercial value, and that such operations lay bare the seam better than could be done by a prospect opening, thus saving these companies the expense of making such prospect openings and assisting them in showing the coal when they are endeavoring to sell or lease.

Thus it appears this mining was permissive; hence the necessary element of hostility is wanting.

In fact, some of the evidence for the defendants indicates it was permissive. Certainly the evidence fails to show it was hostile, and fails to establish the proper continuity.

### Extent of These Possessions.

The phrase "adverse possession" was first coined by Lord Mansfield in Taylor ex dem. Atkyns v. Horde, 1 Burr, 60. It is not a happy expression of the essential

active situation of the entrant who goes on land, or takes into his grasp personal property, with the intent to hold it as his own. The word "possession" does not necessarily in law denote an actual physical contact with the object said to be possessed. He who has the legal title is, as a matter of law, possessed of the subject; this we call "Constructive possession," and this possession can only be ousted by an actual physical entry, and an actual physical occupance thereafter. The correct phrase, therefore and the one descriptive of the relation of the would-be disseisor to the subject, is "adverse occupation and use." That describes exactly what the would-be disseisor shall do that he may eventually hold the land. The phrase has, however, been used too long to be changed now, but it has acquired a definite meaning, and the meaning is "adverse occupation and user," and that is the sense in which the phrase is used everywhere.

### What Possession Have Defendants?

In Lindley on Mines, sec. 812, that question is answered this way:

> "The owner of the mine does not lose his rights as against the owner of the surface by mere non-user. His title can only be defeated by acts which actually take the mineral out of his possession. In a very late case it is said that it is possible that adverse possession might be shown if a certain mine or quarry were surrounded on all sides with galleries and a defined area was so opened out. But, under ordinary circumstances, it is difficult to see how there can be adverse possession of so much of the mines or minerals as lie untouched in their bed."

That appears to be the rule in Ohio, see Gill v. Fletcher, 74 Ohio St. 295, 78 N. E. 433, 113 Am. St. Rep. 962, and it certainly is the rule in New York, see White v. Miller, 78 Misc. 428, 139 N. Y. S. 660, and French v. Lansing, 73 Misc. 80, 132 N. Y. S. 523.

In the case last cited the New York Supreme Court says it has been assumed again and again by courts that by an adverse mining of some of the minerals for the required time title to all the minerals within the disseisor's color would be acquired, and there are listed in that opinion eighteen decisions wherein that has

been said, but that it was not so held in any of them, and in that opinion it was said that but one case had been found where it was so held, and that was the case of House v. Palmer, 9 Ga. 497. We have carefully examined that case. In 1833 Lewis House conveyed the premises to John McClure, reserving to himself the right of digging gold on the premises, on condition that he should test the lot within 18 months, and find it profitable; failing to do this, his right was to cease. House did nothing. In 1837 McClure sold to Palmer, who in 1840 began operating for gold, and continued to do so intermittently until 1849, when House and his lessee Halen began to do so.

Palmer was awarded injunctive relief against them, because House by failing to make his test had forfeited his privilege, so this case is of no persuasive effect.

We have found one case where the title to 11 acres of coal was lost by disseisin, Thomas v. Young, 93 W. Va. 555, 117 S. E. 909, but, in view of the fact that an entry had been driven 500 or 600 feet into a tract of 11 acres, that 27 rooms had been turned off of it, and coal had been mined there for 18 years, working about 20 days a month for 8 months each year, we are not by it persuaded the rule in Lindley on Mines is erroneous.

We have also found a number of cases like the eighteen cited in French v. Lansing, 73 Misc. 80, 132 N. Y. S. 523, where the court speaks of the acquisition of title to minerals by adverse possession, but, excepting the case last cited above, in none of them does the court adjudge a disseisin to have been accomplished. They are Wilson v. Henry, 35 Wis. 241; Sydnor. et al. v. Palmer et al., 29 Wis. 226; Vance v. Clark (C .C. A.) 252 F. 495; Uphoff v. Trustees of Tufts College, 351 Ill. 146, 184 N. E. 213; Grayson-McLeod Lumber Co. v. Duke, 160 Ark. 76, 254 S. W. 350; Steinman Coal Corp. et al. v. Fleming, 145 Va. 731, 134 S. E. 696; J. R. Crowe Coal & Min. Co. v. Atkinson et al., 85 Kan. 357, 116 P. 499, Ann. Cas. 1912D, 1196; Bodcaw Lumber Co. v. Goode, 160 Ark. 48, 254 S. W. 345, 29 A. L. R. 578; Ky. Block Cannel Coal Co. et al. v. Sewell et al. (C. C. A.) 249 F. 840, 1 A. L. R. 556; Pond Creek Coal Co. v. Hatfield (C. C. A.) 239 F. 622; Gordon v. Park, 219 Mo. 600, 117 S. W. 1163; McBeth v. Wetnight, 57 Ind. App. 47, 106 N. E. 407; Bremhorst v. Phillips Coal Co., 202 Iowa, 1251, 211 N. W. 898; Central Trust Co. v.

Harless, 108 W. Va. 618, 152 S. E. 209; Laidley v. Rowe, 275 Pa. 389, 119 A. 474; Claybrooke v. Barnes, 180 Ark. 678, 22 S. W. (2d) 390, 67 A. L. R. 1436; Asher v. Gibson, 198 Ky. 285, 248 S. W. 862; McPherson v. Thompson, 203 Ky. 35, 261 S. W. 853; McKelvy v. Wilkinsburg, etc., Coal Co., 283 Pa. 227, 128 A. 830.

A would-be disseisor who enters under a bare color of title is no better off than one who enters without color and marks off a distinct line around what he intends to occupy. Each, if he acquires any rights, must do so because of his occupation, claim, and use of the premises for the statutory period.

A disseisor upon the surface may actually build upon, occupy, and use but a portion of the territory embraced within his marked line or color, but he has an immediately potential use and occupancy of the remainder of his claim, and the law by construction extends his actual occupation over it, but, when he gets below the surface and attempts to take possession of minerals, he can have no immediately potential use or occupation of the whole of the minerals over which the law can by construction extend his actual possession; therefore he can have no possession of the unmined portion. Their possession was never in advance of their operations, unless they surrounded a block; then they had possession of that block, but no more. They got no more than they loosened or around which they had established a confine. By their operations they may have pushed the mineral owner back, but they have never pushed him off. To disseise the title holder, they must push him off and keep him off. See Flinn v. Blakeman, 254 Ky. 416, 71 S. W. (2d) 961. They could have no actual possession until they had a potential possession, and they have never had any potential possession of the coal that has not been disturbed. The same is true of all of the defendants.

For English decisions to this same effect see Glyn v. Howell, vol. 3 British Ruling Cases 405, (1909) I. Ch. 666, 78 L. J. Ch. N. S. 391, 100 L. T. N. S. 324, 53 Sol. Jo. 269; Ashton vs. Stock, (1877) IV Ch. Div. 719, 25 Week Rep. 862; Thompson vs. Hickman, (1907) I Ch. 550; M'Donnell vs. M'Kinty, (1847) 10 Ir. L. Rep. 514; Earl of Dartmouth vs. Spittle, (1871) 24 L. T. N. S. 67, 19 Week Rep. 444.

The size of these mining operations has no effect upon the result further than the light it throws upon the good faith of their claim of ownership. Their size makes them look like conscious trespasses, like the occasional cutting of timber. If these operations had been made upon property to which these operators had good title, the law would have extended their possession to the whole of the tract, would have held them to be actual possessions of the minerals appurtenant to the entire tract, but a disseisor is no favorite of the law, he holds the laboring oar for 15 years, and must leave no gap unclosed, every presumption is against him, and the way of the disseisor is hard. A title holder has a constructive possession over which his actual possession extends. A disseisor does not have such.

### Possession of Oil and Gas.

The defendants assert they have by their mining of this coal acquired the title to the oil and gas. This might present a question as to whether the adverse possession of one mineral was the adverse possession of all the minerals appurtenant to the tract, but, as we have decided they had no adverse possession of the coal, we need pursue that question no further.

### The Recorded Leases.

The defendants introduce in evidence a large number of recorded oil and gas leases they had made, and argue that without doing any driling they had thereby asserted title to this oil and gas for more than 30 years, and have thereby dispossessed those claiming under Laws. We are not oblivious of the fact that in Herrel v. Porter et al., 8 Ky. Op. page 265, we said:

> "If he entered under a deed purporting to convey the whole estate in the land, and put it upon record, this was such an act as would ordinarily be prima facie evidence of an intention to claim the whole, and his possession would thence forward be adverse to the owners of the coal."

That was dictum pure and simple, as we pointed out in Asher v. Gibson et al., 198 Ky. 285, 248 S. W. 862, when we refused to follow it, and again we are refusing to do so. Similar contentions have been made and disregarded in many cases: Uphoff v. Trustees of Tufts College, 351 Ill. 146, 184 N. E. 213; Renfro v. Hanon,

297 Ill. 353, 130 N. E. 740; Catlin Coal Co. v. Lloyd, 180
Ill. 398, 54 N. E. 214, 72 Am. St. Rep. 216; Kinder v.
LaSalle County Carbon Coal Co., 301 Ill. 362, 133
N. E. 772. Let us remember adverse possession means
adverse occupation and user, which must be wrought
on property in question. It cannot be wrought in the
office of the county clerk no matter how many deeds or
leases the would-be disseisor may record there.

### The After-Acquired Title.

All parties here, both plaintiffs and defendants,
are claiming under Valentine Gearheart, but the de-
fendants say that, when Gearheart made his general
warranty deed to Laws, he did not have perfect title,
and that Gearheart by subsequent possession and pur-
chases perfected his title, and that, when the defendants
acquired their interest, they got perfect title, but Laws
did not because Gearheart did not then have a perfect
title.

There is no merit in this contention, because, when
Gearheart did perfect his title, that inured to the bene-
fit of Laws. See 8 Ky. Digest, Estoppel, 38, where
they will find a score of cases.

### Conclusion.

The claim of title by adverse possession cannot be
sustained, first, because these surface owners have
made no satisfactory efforts to extricate themselves
from their positions of trustee in possession; second,
because it is not satisfactorily shown these operations
were not permissive; and, third, because if they had
made satisfactory showing in all other respects, they
have no showing of continuous and unbroken occupance
and user of the minerals as would give them title
thereto.

When their claim of adverse possession fails, their
plea of champerty goes with it.

The judgment is reversed, the trial court will set
it aside, and in lieu of it enter one in accord with the
prayer of appellants' petition.